MORRISON & FOERSTER LLP
Jamie A. Levitt
Damion K.L. Stodola
1290 Avenue of the Americas
New York, NY 10104-0050
(212) 468-8000
*Attorneys for Plaintiff Verified Identity Pass, Inc.*

*Of Counsel*
Lori A. Schechter
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
(415) 268-7000



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



No. **07 CIV** 6538

| | |
|---|---|
| VERIFIED IDENTITY PASS, INC., d/b/a CLEAR REGISTERED TRAVELER, <br><br> Plaintiff, <br><br> -against- <br><br> FRED FISCHER, SAFLINK CORPORATION, and FLO CORPORATION, <br><br> Defendants. | **COMPLAINT** |

Verified Identity Pass, Inc. d/b/a/ Clear Registered Traveler ("Verified"), by and through its

undersigned attorneys, Morrison & Foerster LLP, as and for its complaint against defendants

Fred Fischer ("Fischer"), Saflink Corporation ("Saflink") and FLO Corporation ("FLO") alleges

upon knowledge as to itself and its actions and upon information and belief as to all other

matters, as follows:

<u>SUMMARY OF THIS ACTION</u>

1.     In this action, plaintiff Verified seeks relief for the unscrupulous competitive

tactics of its former employee, defendant Fischer, who on his last day of employment, remotely

1

made unauthorized access to plaintiff's computer, downloaded whole portions of plaintiff's database containing confidential and proprietary information about plaintiff's business contacts, contract negotiations, and potential customers, and shared the stolen information so that Fischer's new employer, defendant FLO and FLO's parent, defendant Saflink, — competitors of Verified — could benefit. The surreptitious theft and unauthorized use of plaintiff's confidential, trade secret information was revealed by among other things, defendants recent efforts to solicit business through a mass mailing using plaintiff's confidential business contact list, which happened to also include an individual that defendants could not possibly have had on their own business mailing list: a personal friend, in fact the maid-of-honor at the wedding, of a Verified employee who for convenience included the friend's contact information among these confidential business records. Indeed, along with the dissemination to airport officials of lies about plaintiff's business, and the disclosure of other trade secret information, Fischer's numerous tactics to help FLO and Saflink compete unfairly against Verified also included 8 attempts to access Verified's computer systems after Fischer's employment was terminated and while he was in the employ of defendants.

      2.     Plaintiff Verified is the leader and pioneer in a new and emerging field in airport security and customer service. Verified is an approved service provider operating the Registered Traveler Program of the Transportation Security Administration. In violation of federal and state law, as well as contractual obligations, defendants Saflink and FLO, through their Senior Vice President of Strategic Sales, Fred Fischer, have misappropriated, used and unlawfully disclosed Verified's confidential information to compete unfairly with Verified, causing damage and irreparable injury to Verified, and at the same time harming the public by their unlawful acts. This action seeks redress for defendants' violations of the federal Computer Fraud and Abuse

Act, a criminal statute which provides for civil remedies, the New York State Consumer

Protection Statutes, acts of misappropriation of trade secrets, Fischer's breach of his employment

contract, tortious interference with that contract, and conversion. Plaintiff thus seek injunctive

relief to stop the theft and misuse of its confidential and proprietary information, damages and

attorneys' fees.

## JURISDICTION AND VENUE

3.      This Court has federal question jurisdiction over this action under 28 U.S.C.

§ 1331 because the action alleges violation of the Computer Fraud and Abuse Act ("CFAA"), 18

U.S.C. § 1030, *et seq.*

4.      This Court has supplemental jurisdiction over the state law claims under 28

U.S.C. § 1367.

5.      Venue is proper in this district because at all times relevant to this action,

plaintiff's principal place of business was within this district and a substantial part of the events

giving rise to this action occurred in this district, or caused injury to plaintiff and the public in

this district.

## THE PARTIES

6.      Plaintiff Verified is a Delaware corporation with its principal place of business

located at 600 Third Avenue, New York, New York.

7.      Defendant Saflink is a Delaware corporation with its principal place of business in

the State of Washington. Defendant FLO Corporation, a wholly-owned subsidiary of Saflink, is

a Delaware corporation with its principal place of business in the State of Washington.

8.      Defendant Fred Fischer is a resident of North Carolina, and the Senior Vice

President for Strategic Sales of FLO.

9.    At all times alleged herein, each defendant acted as the agent of the other.

## STATEMENT OF FACTS

### Verified is the Pioneer for the Registered Traveler Program

10.    Plaintiff Verified is the leading approved service provider currently operating the Registered Traveler Program of the Transportation Security Administration ("TSA"), a component agency of the Department of Homeland Security responsible for security of the nation's transportation systems.  Verified is widely regarded as the pioneer in this new industry.

11.    The TSA's Registered Traveler Program is a voluntary pre-screening program. Qualified passengers who pass a security background check conducted by the TSA receive a biometric card that allows them to use special expedited security lines at airports across the country that participate in the program.  Airports and airlines are allowed by TSA to choose a service provider to operate the program at airports and airline terminals, whereupon that service provider constructs and staffs the special Registered Traveler lanes and enrolls travelers, who are charged an annual subscription fee and issued a biometric card. The TSA requires that all biometric cards be interoperable, such that a subscriber with a card from one company can use it at any participating airport, regardless of which service provider is operating the Registered Traveler lane at that airport.

12.    Plaintiff Verified was chosen to operate the first private sector Registered Traveler Program in the United States, which opened in the Orlando airport in July 2005.  Since that time, plaintiff has been selected as the Registered Traveler service provider by every airport that has chosen a provider in a competitive bidding process, and it currently has contracts with several airlines and with several airports.  Except for a program run by the Unisys Corporation at the Reno Airport, there are no other companies currently operating the Registered Traveler lanes

at any airport in the United States. Saflink, which now operates under the name of FLO, also competes with Verified, but, upon information and belief, has not been chosen to operate a program by any airport or airline or enrolled a single customer in a Registered Traveler program.

**Defendant Fischer was a Senior Verified Executive with Access To Verified's Trade Secrets**

13.    On or about November 29, 2005, defendant Fischer executed an employment agreement with Verified, and was hired for the position of Senior Vice President of Sales for Verified, commencing on December 5, 2005. Under this agreement, Fischer was a highly compensated executive with Verified.

14.    As Senior Vice President of Sales, Mr. Fischer was a member of Verified's senior management and was responsible for Verified's sales and marketing strategy for corporate sales and strategic partnerships. He was thus responsible for plaintiff's efforts to sell bulk employee memberships in Verified's Registered Traveler program to major corporations and for arranging co-marketing partnerships with major travel industry corporations, such as rental car companies and hotel chains, and corporate travel management companies. In this position, Fischer was exposed to a great deal of Verified's most sensitive, proprietary and confidential information, particularly having to do with pricing, marketing strategies, and corporate business contacts, partners and customers.

15.    Fischer was well aware that Verified considered this information to be proprietary and confidential. For example, in his November 2005 employment agreement he agreed that "as a key executive of the company" he would "be privy to the company's trade secrets, customer accounts, business practices and other proprietary information" and he agreed "to keep such information strictly confidential for a term of five years following" the termination of his employment.

16.    Fischer also agreed to abide by all of the provisions of Verified's employee handbook, "including but not limited to, [Verified's] strict policies and practices with regard to the protection of the privacy of [its] customer accounts." As with Fischer's employment agreement, Verified's employee handbook impressed upon each employee the importance of maintaining the confidentiality of Verified's proprietary information. Verified's employee handbook states: "We regard our business plan, customer lists, published documents and internal work product to be proprietary and confidential. We will fire anyone who reveals any of this without authorization."

**Plaintiff's Salesforce Database Contains Confidential And Trade Secret Information**

17.    During his employment, Fischer was one of only seven senior employees who had access to Verified's Salesforce Database (the "Database").

18.    The Database is an electronic database which contains highly valuable commercially sensitive, confidential and proprietary information used by Verified's senior sales executives to keep track of important sales contacts, including officials and employees of various airports whose contracts Verified has sought and/or secured, and representatives, employees, and agents of various companies and employers whose business Verified seeks, or who are otherwise involved as strategic partners of Verified. The Database includes, not only contact information, but also personal information for contacts, as well as sensitive and confidential information regarding deals, negotiations, and updates on the status of each sales contact.  The data contained in the Database was compiled based upon the significant efforts of multiple Verified employees over multiple years to establish contacts and potential business relationships.

19.    Typically, after a member of Verified's sales team develops a relationship with the management team of an airport or other strategic partner, he or she would update the

Database to reflect the new relationship or changes in the status of the relationship. In fact, the Database was designed to be web-based, so that Verified's sales executives could update it immediately from anywhere in the world, to allow other executives at Verified to make immediate use of this valuable information.

20.    This data includes information that is not publicly known, such as names and contact information for key decision makers with respect to security at airports across the country, at major travel companies who have or might become Verified's strategic partners, and at major corporations who purchase travel services for their employees. The Database also contains personal information for these contacts, as well sensitive and confidential notes, comments, and other information regarding negotiations, deals, and the status of such, all of which is essential for the growth and development of Verified's business and little of which could be known to others outside of the company.

21.    Verified has expended considerable time and money in developing relationships with key decision makers within the nation's airports, and with its strategic partners. In this new industry these relationships are crucial to Verified's ability to compete, and ultimately to Verified's success in this emerging new field. As important is the fact that Verified operates in the extremely sensitive field of airport security where a reputation as a trustworthy and security conscious company as well as the integrity of Verified's computer systems is critical to the company's success.

22.    Because the Registered Traveler field is still a relatively new, emerging field, airports and key travel industry players (such as airlines, hotel chains, rental car companies, and credit card providers) are right now making key decisions about alliances that will shape the industry and affect the fortunes of companies like Verified for years to come. Being able to

compete fairly in this environment is crucial to Verified. Registered Travel is Verified's only business, and thus its industry specific contact information, and information regarding its negotiations, deals and strategic partnerships is extremely sensitive. It is also extremely valuable, because Verified, as the pioneer in this industry, created much of the business model and structure for this evolving industry in areas such as pricing, marketing partnerships with hotel or rental car chains, and terms and conditions for large corporate purchases of memberships for employees.

23.     Verified engaged in substantial efforts to keep the information in the Database private and secure in addition to securing confidentiality agreements and enforcing confidentiality policies. The only way to access or edit information on the Database is through a password protected Verified terminal or through a password protected website. Plaintiff kept an electronic log of all attempts to access the Database, whether successful or unsuccessful.

24.     The few individuals, including defendant Fischer, who had access to the Database were constantly reminded by senior management, including Steven Brill, Verified's CEO, that the Database contained confidential and proprietary information crucial to Verified's business success, and that these key employees are required to take special care to maintain the confidentiality of this information. Such warnings were communicated to Fischer.

**Fischer Stole Confidential & Proprietary Information From The Salesforce Database**

25.     In November 2006, Verified informed Fischer that his employment was terminated and that December 5, 2006 would be his last day.

26.     On December 5, 2006, Fischer's last day of employment with Verified, Fischer was not in the office, but logged into Verified's computer system remotely and downloaded portions of the Database, including confidential and valuable contact information into an Excel

spreadsheet on his computer. This access to Verified's computer systems and download was unauthorized and exceeded any authorized access Fischer had to Verified's computer systems.

27.    Shortly after Fischer's termination from Verified, he began working for Verified's competitor, FLO. FLO directly competes with Verified in seeking to obtain contracts to operate the Registered Traveler program at airports across the United States. FLO also competes with Verified in the sale of memberships in registered traveler programs to corporate travel departments, employers and other individuals who then become eligible for biometric cards that allow travelers to use the special expedited airport security lanes at various airports.

28.    On March 26, 2007, Saflink, FLO's parent, issued a press release announcing that Fred Fischer had been appointed as "Senior Vice President, Strategic Sales," and would be responsible for sales of the "FLO Registered Traveler (RT) program to corporations, travel management companies, airlines, credit card companies and retail partners."

**Fischer Engaged In Repeated Misconduct On Behalf Of Defendants FLO And Saflink**

29.    Since Fischer commenced employment at FLO, he has repeatedly attempted to interfere with Verified's efforts to lawfully compete for airport contracts and memberships in its Registered Traveler Program by, among other things, using Verified's proprietary and confidential information, all of it learned by Fischer during his employment and much of it retrieved unlawfully on his last day at Verified, to advantage FLO and Saflink, his new employer.

30.    On or about February 23, 2007, the Little Rock Airport Commission (the "Commission") issued a request for proposals seeking to implement a Registered Traveler program at the Little Rock Municipal Airport. Verified and FLO, along with one other company, submitted proposals in response to the RFP. FLO's proposal was submitted on March 28, 2007,

just two days after Fischer joined FLO. As has been the practice at other airports, the Little Rock RFP stated that all of the bids for the airport contract would be publicly opened after submission. Verified obtained a copy of FLO's Little Rock Proposal from the Commission based upon a routine Freedom of Information Act (FOIA) request.

31.    Each of the three bidders in Little Rock delivered an oral presentation to members of the Airport Commission at a public hearing on April 11, 2007. As a courtesy, the Airport Commission asked each bidder not to attend the other bidders' presentations. The oral presentations were recorded by the Commission and later transcribed at their request. Defendant Fischer was one of FLO's representatives at the oral presentation, and participated in FLO's presentation to the Commission. During his presentation, Fischer, in violation of his employment agreement, disclosed confidential and proprietary information he learned while employed as a Senior Vice President at Verified.

- About Verified's revenue sharing formula and method, prefacing his comment with this introduction: "As far as I know from working for our competitor…" (Tr. at p. 30 & pp. 17-18);

- About how corporate travel managers regard the idea of reimbursing employees for a Registered Traveler card, prefacing those remarks with the reminder that he came "to FLO from Verified Identity" where he had "seen over 250 corporate travel managers across the country" of which "only two corporations said they wouldn't reimburse for the card" (Tr. at p. 26);

- About Verified's terms and conditions for setting up mobile enrollments at corporations, declaring that the Commission will "hear from our competitors" that they will only set up remote kiosks to sign up customers for the Registered Traveler Program, if a company will have a minimum of 250 people to enroll. (Tr. at p. 35).

32.    On or about April 18, 2007, Verified was notified that it had been awarded the contract for the Little Rock Registered Traveler Program. Upon learning that it did not get the contract, defendant FLO requested a debriefing from the Commission.

33.    On April 23, 2007, representatives for FLO, including Fischer, had a telephone conference with Ronald Mathieu, the Little Rock National Airport's Deputy Executive Director, to debrief the Commission as to why FLO was not selected as the winning bidder. During that telephone call, Fischer made false statements about Verified. Among other things, after Fischer stated that he had come from Verified, he indicated that he was "number three" there, and that Verified falsely represented the number of its card holders. He also asserted that Verified's biometric cards are "not interoperable" and "the program is not even interoperable in their own company." These statements made by defendant Fischer, on behalf of FLO, were inaccurate, misrepresentative and false.

34.    Verified sent a registered letter to Fischer on May 22, 2007, notifying Fischer that during his presentation to the Little Rock Airport, he improperly revealed confidential and proprietary Verified information to the Airport commissioners in violation of the confidentiality provisions of his Employment Agreement.

**Defendants Saflink And FLO Knew About Fischer's Unscrupulous Competitive Tactics**

35.    After the April 23, 2007, phone conference with Mr. Mathieu, defendant FLO filed a protest with the Commission, asserting that the bidding process had been compromised because the Commission provided Verified with access to FLO's Little Rock Proposal, in response to Verified's FOIA request. The Commission denied FLO's protest.

36.    After its protest was denied, on May 25, 2007, FLO sued Verified in California Superior Court, in San Francisco (the "California Action"), alleging that Verified stole its trade

secrets based upon the Commission's disclosure of FLO's proposal in response to the FOIA request. Days after filing the complaint, FLO sought a temporary restraining order seeking, among other things, to preclude Verified employees from participating in any bid on the San Francisco International Airport Registered Traveler program and any future airport project. The TRO was denied.

37. FLO next filed a second lawsuit, on June 4, 2007, in the United States District Court for the Eastern District of Arkansas ("the Arkansas Action"), against the Commission, seeking to enjoin the Commission from awarding the Little Rock contract to Verified. Verified was granted the right to intervene in the Arkansas Action on June 11, 2007. On June 12, 2007, a hearing was held in the Arkansas Action, and the court dismissed the case on jurisdictional grounds.

38. After the June 12, 2007 hearing, Verified agreed not to seek legal fees from FLO under California's trade secret statute for FLO's bad faith litigation in return for FLO ceasing all such litigation and acknowledging that Verified's conduct has been lawful and honorable at all times. Specifically, FLO agreed to cessation of the California Action and the Arkansas Action with a dismissal with prejudice by FLO of all claims alleged against Verified in the California Action, no payment of money by Verified, and a waiver by FLO of all appeal rights from the dismissal of the Arkansas Action. The parties finalized and signed the settlement agreement on June 14, 2007 (the "Settlement Agreement").

39. As a result of the proceedings in the California and Arkansas Actions, FLO was put on notice, if it was not previously aware, of Fischer's unscrupulous competitive tactics while acting in his capacity as Senior Vice President for FLO. Saflink and FLO senior management reviewed the transcript of statements made by Fischer during the April 11 Hearing and the audio

tape of Fischer's comments in the April 23 telephone conference. FLO's President, Mr. Argenbright, apologized for Fischer's misconduct and said that Fischer "was sometimes an unguided missile, but we will control him."

## Fischer Continued To Seek Access To Verified's Computer Systems To Benefit Defendants

40.    Since his employment with Verified was terminated, defendant Fischer made at least eight separate attempts to access plaintiff's computer systems and the Database. On January 31, 2007, April 6, 2007, June 12, 2007, and June 29, 2007, Fischer attempted to access the Database. On February 20, 2007, Fischer made four attempts to access Verified's computer network.

41.    Since Fischer began working for FLO, defendants sent, or caused to be sent, at least three mass e-mailings to contacts retrieved from plaintiff's Database. All were sent after Fischer was put on notice via the May 22, 2007 registered letter of his prior breach of his contractual obligation not to reveal or use Verified's proprietary information. These emails were sent by Mitchell@businesstravelcoalition.com on behalf of defendants FLO and Saflink and reference defendant Fischer. On its home page, www.businesstravelcoalition.com, is a link to FLO's website. The Business Travelers Coalition and FLO are business partners, have contractual relations, and at all time relevant hereto, the Business Travelers Coalition was acting as the agent for FLO and/or Saflink and/or Fischer.

42.    Among the mass e-mailings were the following: In early July, defendants sent an email to contacts in Verified's Database giving the recipients an opportunity to opt-out of defendants' mailing list.

43.    About a week later, on or about July 10, 2007, defendants sent an e-mail to contacts in Verified's Database offering a 35% discount if they entered into "a non-binding letter

of intent" with Saflink by July 20, 2007 and advising recipients to contact defendant Fischer at
FLO Corporation.

44.    That same day, Verified received several e-mails from persons in the Database
forwarding the solicitation they had received. Several of the recipients who contacted Verified
were people that, although in Verified's Database, have no reason to be solicited by Saflink, FLO
or any other Registered Traveler competitor. For example, these e-mails were sent to a good
friend — the maid-of-honor — of  Verified's Senior Vice President of Corporate Development,
Allison Beer. This friend lives in Canada, has no relation to the aviation, airline, or Registered
Traveler industry, FLO, Saflink, or any employer likely to be solicited for the Registered
Traveler program in the United States. Her personal contact information is among the few
personal contacts included by Ms. Beer in the Database for her convenience. There is no
legitimate reason why defendants would include her in a solicitation.

45.    Some of the other persons solicited by defendants, whose contact information
defendants could only have obtained from the Database, include Verified outside lawyers, an
independent contractor and lobbyist for Verified, two internal contacts from one of Verified's
partners at Lockheed Martin, a staffing provider, a subcontractor for Verified, and even a
Verified employee. The contact information for these individuals is not publicly available and
would be extremely difficult, if not impossible, for someone to locate. None of these individuals
received e-mails from defendants prior to Fischer's employment with FLO.

46.    The defendants have been using the Database to solicit business, as e-mails were
being indiscriminately sent to persons in the Database.

47.    On or around July 10, 2007, Verified's CEO, Steven Brill, attempted to contact
FLO's President, Glen Argenbright, and left two voicemail messages, one of which was about

defendant Fischer's misconduct and both of which urgently requested Mr. Argenbright's response. Mr. Argenbright did not return Mr. Brill's calls.

48.    To the contrary, the following week, on July 16, 2007, defendants sent another mass email requesting that its recipients participate in a 7-minute survey "regarding several aspects of the registered travel program that the Business Travel Coalition is conducting on behalf of the FLO Corporation." This e-mail was also received by persons whose contact information is contained in Verified's Database.

49.    After the July 10th e-mailing, Verified immediately started investigating how defendants were able to obtain its contacts for its own solicitations. Verfied hired Kroll Ontrack, Inc. to perform a computer forensic analysis to determine the extent of Fischer's intrusion into its system, what Fischer accessed, and to assess and remediate any damage to the system and to implement remedial safeguards to the system. Kroll's work to date has cost Verified in excess of $5,000.

50.    As a result of defendants' misconduct, Verified has sustained damages or loss in excess of $5,000, in an amount to be proven at trial, and has suffered and continues to suffer irreparable injury for which no adequate remedy at law can redress.

## COUNT I

### (Violation Of Computer Fraud And Abuse Act Against All Defendants)

51.    Plaintiff repeats, realleges and incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 50 above.

52.    Verified's computer system, including the Salesforce Database, is a "protected computer," in that the computer system is used in interstate and foreign commerce.

53.    In violation of 18 USC § 1030 (a)(2)(C), (a)(4) and (a)(5), on December 5, 2006,

defendant Fisher knowingly and intentionally accessed, without authorization, and/or exceeded authorized access of, Verified's computer system and downloaded, exported or otherwise obtained valuable, confidential information from Verified in furtherance of his misappropriation and other wrongdoing alleged herein.

54.    In violation of 18 USC § 1030 (a)(5), on or about January 31, 2007, February 20, 2007, April 6, 2007, June 12, 2007 and June 29, 2007, defendant Fischer, and defendants Saflink and FLO through Fischer's acts, intentionally attempted to access plaintiff's computers without authorization.

55.    As a direct and proximate result of defendants' conduct, Verified has suffered loss in excess of $5,000 relating to the unauthorized access and attempted access of its computers by defendants, including costs incurred in connection with the retention of computer forensic specialists to investigate and assess the access and damage to the computer system, remedial measures necessary for the system, and to further safeguard its computer system.

56.    Pursuant to 18 USC § 1030(g), Verified is entitled to equitable relief and economic damages in an amount to be determined at trial, resulting from defendants' conduct.

## COUNT II

### (Breach Of Contract Against Defendant Fischer)

57.    Plaintiff repeats, realleges and incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 56 above.

58.    On or about November 29, 2005, defendant Fischer signed an employment contract with the plaintiff for the position of Senior Vice President of Sales at Verified (the "Employment Contract"). In November 2006 defendant Fischer was terminated from his position, and his last day of employment was December 5, 2006.

59.    The Employment Contract specifically and clearly includes a confidentiality
provision ("the Confidentiality Provision"), which states that Fischer agrees to keep all
"company trade secrets, customer accounts, business practices and other proprietary
information...strictly confidential *for a term of five years* following" the termination of his
employment relationship with Verified. (emphasis added)

60.    In addition, defendant Fischer was given a copy of the Employee Handbook,
which reiterates that plaintiff "regard(s) our business plan, customer lists, published documents
and internal work product to be proprietary and confidential." All Verified employees,
regardless of status are required to read, and sign an acknowledgement that they have read, the
Employee Handbook.

61.    The Employment Contract provides for both equitable and monetary relief in the
event of a violation of the Confidentiality Provision.

62.    The Employment Contract is a valid, lawful and enforceable contract and plaintiff
fully performed its obligations under it.

63.    Defendant Fischer breached his lawful obligation to plaintiff under the
Employment Contract.

64.    As a result of defendant Fischer's breach, plaintiff has been damaged in an
amount that is uncertain at this time and subject to proof at trial.

65.    Unless defendant Fischer is restrained by appropriate temporary, preliminary
and/or permanent injunctive relief, his conduct will cause plaintiff immediate, continuing and
irreparable harm for which there is no adequate remedy at law.

## COUNT III

### (Misappropriation Of Trade Secrets Against All Defendants)

66.    Plaintiff repeats, realleges and incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 65 above.

67.    Verified's confidential information, including Verified's Salesforce Database, revenue arrangements, contractual terms, and requirements for remote kiosks and corporate memberships, and other terms of Verified's business relationships, is not generally known outside of Verified and its partners and could not easily be acquired or duplicated by persons outside of Verified. The confidential information took considerable time, effort and resources to compile, would be difficult to replicate and is extremely valuable to Verified's competitors. Verified took significant measures to maintain and secure the confidentiality of its information, including limiting access to the information to a small group of plaintiff's employees, who must access it through a secure system.

68.    Defendants acquired, disclosed and used this information by improper means and in breach of Fischer's contractual and fiduciary obligations to Verified to maintain the secrecy of the confidential information and use it solely for Verified's benefit.

69.    As a proximate result of defendants' acts, plaintiff has been damaged in an amount that is uncertain at this time and subject to proof at trial.

70.    Unless defendants Fischer, Saflink and FLO are restrained by appropriate temporary, preliminary and/or permanent injunctive relief, their past and ongoing conduct will cause plaintiff immediate, continuing and irreparable harm for which there is no adequate remedy at law.

## COUNT IV

### (Tortious Interference With An Existing Contract
### Against Defendants Saflink And FLO)

71.    Plaintiff repeats, realleges and incorporates by reference as though fully set forth

herein the allegations in paragraphs 1 through 70 above.

72.    Upon information and belief, defendants Saflink and FLO were aware of

defendant Fischer's contractual relationship and obligation to plaintiff under the Confidentiality

Provision of Fischer's Employment Agreement.

73.    Upon information and belief, defendants Saflink and FLO intentionally,

deliberately and without any justification, economic or otherwise, induced and encouraged

defendant Fischer to breach his contractual duty to plaintiff under the Confidentiality Provision

referenced herein.

74.    As a proximate result of defendants Saflink's and FLO's acts, plaintiff has been

damaged in an amount that is uncertain at this time and subject to proof at trial.

75.    Unless defendants Saflink and FLO are restrained by appropriate temporary,

preliminary and/or permanent injunctive relief, their conduct will cause plaintiff immediate,

continuing and irreparable harm for which there is no adequate remedy at law.

76.    Plaintiff is also entitled to punitive damages for defendants' wrongful, willful,

wanton and malicious acts in an amount to be determined at trial.

## COUNT V

### (Conversion Against Defendant Fischer)

77.    Plaintiff repeats, realleges and incorporates by reference as though fully set forth

herein the allegations in paragraphs 1 through 76 above.

78.    Defendant Fischer wrongfully possessed confidential trade secrets belonging to

plaintiff that were electronic data stored on a computer, indistinguishable from printed documents.

79.    Defendant converted plaintiff's electronic records and deprived plaintiff of its exclusive right over the property.

80.    Defendant Fischer deprived plaintiff's personal property of its value by disclosing its confidential contents and thereby stripping its value.

81.    Plaintiff is entitled to compensatory damages for defendant Fischer's conversion of personal property in an amount to be determined at trial.

## COUNT VI

### (Deceptive Practices And Acts In The Conduct Of Business Against All Defendants)

82.    Plaintiff repeats, realleges and incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 81 above.

83.    Defendants' acts, including the misappropriation and use of plaintiff's confidential trade secrets, and the disparaging, deceptive and false remarks made to officials at public authorities, constitute deceptive acts and practices in the conduct of business and are continuing and have caused injury and damage to plaintiff and its customers, in violation of N.Y. Gen Bus. Law § 349(h).

84.    The Registered Traveler Program is a matter of public interest because it involves the security lanes at the nation's airports and public processes to select approved providers.

85.    Defendants' actions have caused and will continue to cause irreparable harm and damage both to plaintiff and to the public.

86.    Unless defendants are restrained by appropriate temporary, preliminary and/or permanent injunctive relief, their conduct will continue to cause plaintiff and the public

immediate and irreparable harm for which there is no adequate remedy at law.

## RELIEF REQUESTED

**WHEREFORE**, plaintiff Verified respectfully requests that the Court enter judgment in favor of Verified as follows:

1.      That defendants, their corporate officers, directors, agents, employees, affiliates, privies, successors and assigns, and all those acting in concert or participation with them, including Kevin Mitchell and the Business Travel Coalition, immediately return to plaintiff or certify the destruction of all hard and electronic copies of all confidential or proprietary information of plaintiff, including but not limited to any contact information, customer lists or any portion of plaintiff's Salesforce database in any form, or any other proprietary information of plaintiff's shared or obtained by defendant Fischer, including information about plaintiff's business relationships, contracts, and revenue arrangements; and

2.      That defendants, their corporate officers, directors, agents, employees, affiliates, privies, successors and assigns, and all those acting in concert or participation with them, including Kevin Mitchell and the Business Travel Coalition, be preliminarily and permanently enjoined and restrained from:

(a)      soliciting for business any and all individuals and corporations affiliated with individuals whose contact or other information was contained in plaintiff's Salesforce Database for a period of 6 months; and

(b)      making sales to any individual, corporation, or other entity whose information was contained in plaintiff's Salesforce Database for a period of 6 months; and

        (c)       using, disclosing, misappropriating or otherwise utilizing plaintiff's proprietary or confidential information, including, but not limited to plaintiff's confidential contact lists; and

        (d)       making disparaging, false, misrepresentative statements to any third party regarding plaintiff, including but not limited to statements about plaintiff's business practices, customers or contacts, negotiations, marketing technique and/or sales techniques; and

        (e)       any other and further conduct as the court may seem just and proper

3.      On all claims for relief, awarding compensatory damages in an amount to be determined at the trial on the merits of this action;

4.      Awarding punitive damages in an amount to be determined at the trial on the merits of this action; and

5.      Awarding plaintiff all costs and disbursements of this action, including attorneys fees, and expenses; and

6.      Awarding plaintiff such other and further relief as this court may deem just, proper and necessary or appropriate under the circumstances.

Dated: New York, New York
       July 19, 2007

                            MORRISON & FOERSTER LLP

                            By:                   
                            Jamie A. Levitt
                            Damion K.L. Stodola
                            1290 Avenue of the Americas
                            New York, New York  10104-0012
                            (212) 468-8000

                            *Attorneys for Plaintiff Verified Identity Pass, Inc.*

*Of Counsel*

Lori A. Schechter
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
(415) 268-7000