MORRISON & FOERSTER LLP
Jamie A. Levitt
Damion K.L. Stodola
1290 Avenue of the Americas
New York, NY 10104-0050
(212) 468-8000
*Attorneys for Plaintiff Verified Identity Pass, Inc.*

*Of Counsel*
Lori A. Schechter
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
(415) 268-7000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VERIFIED IDENTITY PASS, INC., d/b/a CLEAR REGISTERED TRAVELER,<br><br>Plaintiff,<br><br>-against-<br><br>FRED FISCHER, SAFLINK CORPORATION, and FLO CORPORATION,<br><br>Defendants. | Case No. 07 Civ. ___<br><br>AFFIDAVIT OF STEVEN BRILL IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |

STATE OF NEW YORK   )
                    : ss.:
COUNTY OF NEW YORK  )

STEVEN BRILL, being duly sworn, deposes and says:

1. I am the founder and Chief Executive Officer of Verified Identity Pass, Inc. ("Verified"). I make this affidavit in support of Verified's request for a temporary restraining order and preliminary injunctive relief. Unless stated otherwise, I have personal knowledge of the matters stated in this affidavit, and if called as a witness, could testify competently thereto.

**Verified's Company Background**

2. Verified is the leading approved service provider currently operating the Registered Traveler Program of the Transportation Security Administration ("TSA"). The

sf-2354558v1

TSA's Registered Traveler Program is a voluntary pre-screening program. Qualified passengers who pass a security background check conducted by the TSA receive a biometric card that allows them to use special expedited security lines at airports across the country that participate in the program. Airports and airlines are allowed by TSA to choose a service provider to operate the program at airports and airline terminals, whereupon that service provider constructs and staffs the special Registered Traveler lanes and enrolls travelers, who are charged an annual subscription fee.

3.  Verified was chosen to operate the first private sector Registered Traveler Program in the United States, which opened in the Orlando airport in July 2005. Since that time, based upon our experience and our strong customer service record, Verified has been selected as the Registered Traveler service provider by every airport that has chosen a provider in a competitive bidding process. Verified currently has contracts with several airlines at JFK, with Air Tran Airways at La Guardia, and with Virgin Atlantic at Newark Airport, as well as contracts with the Albany, San Jose, Indianapolis, Cincinnati, Westchester County, and Orlando Airports. In addition, Verified has signed a contract with the San Francisco Airport to begin a program there in September. Except for a program run by the Unisys Corporation at the Reno Airport, there are no other companies currently operating the Registered Traveler lanes at any airport in the United States. A third company, Saflink Corporation ("Saflink"), which now operates under the name of FLO, also competes with Verified but I am informed and believe that Saflink, so far, has never been chosen to operate a program by any airport or airline or enrolled a single customer in a Registered Traveler program.

**Fred Fischer's Employment at Verified**

4.  Fred Fischer was hired for the position of Senior Vice President of Sales for Verified, commencing on December 5, 2005. As Senior Vice President of Sales, Mr. Fischer was a member of Verified's senior management and was responsible for Verified's sales and marketing strategy for corporate sales and strategic partnerships. He was thus responsible for our efforts to sell bulk employee memberships in our program to major corporations and for

arranging co-marketing partnerships with major travel industry corporations, such as rental car companies and hotel chains, and corporate travel management companies. In this position, Mr. Fischer was exposed to a great deal of our most sensitive, proprietary and confidential information, particularly having to do with our pricing, marketing strategies, and corporate business contacts, partners and customers.

5.  Mr. Fischer was well aware that Verified considered this information to be proprietary and confidential. For example, in the November 2005 agreement that Mr. Fischer executed before commencing his employment, Mr. Fischer acknowledged that "as a key executive of the company" he would "be privy to the company's trade secrets, customer accounts, business practices and other proprietary information" and he agreed "to keep such information strictly confidential for a term of five years following" the termination of his employment. Mr. Fischer also agreed to abide by all of the provisions of Verified's employee handbook, "including but not limited to, our strict policies and practices with regard to the protection of the privacy of our customer accounts." A true and correct copy of the employment agreement, signed by Fred Fischer on November 29, 2005, is attached hereto as Exhibit A.

6.  As with Mr. Fischer's employment agreement, Verified's employee handbook impressed upon each employee the importance of maintaining the confidentiality of Verified's proprietary information. Our employee handbook states on page 22: "We regard our business plan, customer lists, published documents and internal work product to be proprietary and confidential. We will fire anyone who reveals any of this without authorization." A true and correct copy of the employee handbook is attached hereto as Exhibit B.

7.  During his employment, Mr. Fischer was one of only seven senior employees who had access to our Salesforce Database (the "Database"). The Database is an electronic database which contains highly sensitive, confidential and proprietary information used by Verified's senior sales executives to keep track of business contacts, partners, prospective partners, the status of contracts and negotiations, and other information. The data contained in the Database was compiled based upon the significant efforts of multiple Verified employees over multiple

years to establish contacts and potential business relationships. This data includes information that is not publicly known, such as names and contact information for key decision makers at airports across the country, at major travel companies who have or might become Verified's strategic partners, and at major corporations who purchase travel services for their employees. The Database also contains personal information for these contacts, as well sensitive and confidential notes, comments, and other information regarding negotiations, deals, and the status of such, all of which is essential for the growth and development of Verified's business and little of which could be known to others outside our company.

8.  Because the Registered Traveler field is still a relatively new, emerging field, airports and key travel industry players (such as airlines, hotel chains, rental car companies, and credit card providers) are right now making key decisions about alliances that will shape the industry and affect the fortunes of companies like ours for years to come. Being able to compete fairly in this environment is crucial to Verified. Registered Travel is all that we do. Consequently, our industry specific contact information, and information regarding our negotiations, deals and strategic partnerships is extremely sensitive. It has thus been my constant practice to remind the few individuals who have access to the Database that it contains confidential and proprietary information that is crucial to our business success, and that they are required to take special care to maintain the confidentiality of this information. I specifically recall making such comments to Mr. Fischer.

**Fred Fischer's Termination from Verified**

9.  In November 2006, I informed Mr. Fischer that Verified was terminating his employment, and that December 5, 2006 would be his last day.

10. On December 5, 2006, Mr. Fischer was not in the office, but we have just recently learned that he improperly logged on to our system remotely that morning and downloaded our entire contact list from the Salesforce Database into an Excel Spreadsheet on his computer. This access to Verified's computer systems and download was unauthorized and exceeded any

authorized access Fischer had to Verified's computer systems. This was just the beginning of the conduct at issue in this suit, which I describe more fully below.

11. Shortly after Mr. Fischer's termination from Verified, he began working for one of Verified's competitors in the Registered Traveler Program market, FLO Corporation ("FLO").

12. FLO directly competes with Verified in seeking to obtain contracts to operate the Registered Traveler program at airports across the United States, including in the bids for the Registered Traveler program for the Little Rock Municipal Airport and for the San Francisco International Airport. Based on public statements by Saflink, FLO's parent corporation, and the Huntsville, Alabama airport, I am informed and believe that to date, Huntsville is the only airport with which FLO has a relationship regarding Registered Traveler Program services, although that relationship, as stated in Saflink disclosure documents, seems to be only an agreement to explore the feasibility of a Registered Traveler Program.

13. FLO also competes with Verified in the sale of memberships in registered traveler programs to corporate travel departments, employers and other individuals who then become eligible for biometric cards that allow travelers to use the special expedited airport security lanes at various airports. It is how FLO chose to compete for this business that brings us back to Verified's former employee, Mr. Fischer.

14. On March 26, 2007, Saflink issued a press release announcing that Fred Fischer had been appointed as "Senior Vice President, Strategic Sales," and would be responsible for sales of the "FLO Registered Traveler (RT) program to corporations, travel management companies, airlines, credit card companies and retail partners." A true and correct copy of the March 26, 2007 Saflink Corporation press release is attached hereto as Exhibit C.

15. Since Mr. Fischer commenced employment at FLO, he has repeatedly attempted to interfere with Verified's efforts to lawfully compete for airport contracts and memberships in its Registered Traveler Program by, among other things, using proprietary and confidential information of Verified that Mr. Fischer learned during his employment, to advantage FLO and Saflink, his new employer. I describe these efforts in the order in which I learned them.

sf-2354558 v1

**The Bidding for the Little Rock Municipal Airport Registered Traveler Program**

16. On February 23, 2007, the Little Rock Airport Commission (the "Commission") issued a request for proposals seeking to implement a Registered Traveler program at the Little Rock Municipal Airport. Verified and FLO, along with one other company, submitted proposals in response to the RFP. FLO'a proposal was submitted on March 28, 2007, just two days after Mr. Fischer joined FLO. As has been the practice at other airports, the Little Rock RFP stated that all of the bids for the airport contract would be publicly opened after submission. Verified obtained a copy of FLO's Little Rock Proposal from the Commission based upon a routine Freedom of Information Act (FOIA) request.

17. Each of the three bidders in Little Rock delivered an oral presentation to members of the Airport Commission at a public hearing on April 11, 2007. As a courtesy, the Airport Commission asked each bidder not to attend the other bidders' presentations. The oral presentations were recorded by the Commission and Verified obtained a copy of the transcript. I am informed and believe that FLO also obtained a copy of the transcript.

18. I have reviewed the transcript of the April 11, 2007 hearing, and from that transcript learned that Fred Fischer was one of FLO's representatives at the oral presentation before the Commission. The transcript, in which Mr. Fischer is identified as "Mr. 2," reveals that during his presentation Mr. Fischer, in violation of his employment agreement, referenced confidential and proprietary information he learned while employed as a Senior Vice President at Verified. For example, Mr. Fischer told the Commission:

- About Verified's revenue sharing formula and method, prefacing his comment with this introduction: "As far as I know from working for our competitor..." (Tr. at p. 30 & pp. 17-18);
- About how corporate travel managers regard the idea of reimbursing employees for a Registered Traveler card, prefacing those remarks with the reminder that he came "to FLO from Verified Identity" where he had "seen over 250 corporate travel managers

   across the country" of which "only two corporations said they wouldn't reimburse for the card" (Tr. at p. 26);

- About Verified's terms and conditions for setting up mobile enrollments at corporations, declaring that the Commission will "hear from our competitors" that they will only set up remote kiosks to sign up customers for the Registered Traveler Program, if a company will have a minimum of 250 people to enroll. (Tr. at p. 35).

A true and correct copy of excerpts from transcript of the April 11, 2007 hearing, transcribing FLO's presentation, is attached hereto as Exhibit D.

19.   On or about, April 18, 2007, Verified was notified that it had been awarded the contract for the Little Rock Registered Traveler program. I am informed and believe that after learning that it did not get the contract, FLO requested a debriefing from the Commission.

20.   On April 23, 2007, representatives for FLO, including Mr. Fischer, had a telephone conference with Ronald Mathieu, the Little Rock National Airport's Deputy Executive Director, to debrief the Commission as to why FLO was not selected as the winning bidder. During that conversation, FLO was advised that its lack of demonstrated experience precluded it from winning the bid.

21.   During the legal proceedings, described below, our counsel obtained an audio tape made by Mr. Mathieu of the April 23, 2007 telephone conference between FLO representatives, including Mr. Fischer, and Mr. Mathieu, which I have listened to. During that call, Mr. Fischer made false statements about Verified. Among other things, after Mr. Fischer stated that he had come from Verified, he indicated that he was "number three" there, and that Verified falsely represented the number of its card holders. He also asserted that Verified's biometric cards are "not interoperable" and "the program's not even interoperable in their own company." These statements are completely false. A true and correct copy of a transcription of the April 23, 2007 telephone call is attached hereto as Exhibit E (See p. 8:22; p. 9:18-19; p. 9:22-23).

22.     Verified sent a registered letter to Fischer on May 22, 2007, notifying Fischer that during his presentation to the Little Rock Airport, he improperly revealed confidential and proprietary Verified information to the Airport commissioners in violation of the confidentiality provisions of his Employment Agreement. A true and correct copy of the May 22 registered letter is attached hereto as Exhibit F.

**The Lawsuits FLO Instigated Regarding the Little Rock Airport Bidding Process**

23.     After the April 23, 2007, phone conference with Mr. Mathieu, FLO filed a protest with the Commission, asserting that the bidding process had been compromised because the Commission provided Verified with access to FLO's Little Rock Proposal, in response to Verified's FOIA request. On May 29, 2007, the Commission notified FLO that its protest would be denied.

24.     On May 25, 2007, FLO brought an action against Verified in California Superior Court, in San Francisco (the "California Action"), alleging that Verified misappropriated its trade secrets based upon the Commission's disclosure of FLO's proposal in response to the FOIA request. Just days after filing the Complaint, FLO sought a temporary restraining order seeking, essentially, to preclude Verified from bidding on the San Francisco International Airport Registered Traveler program, and any future airport project. The request was denied on May 31, 2007.

25.     After losing on its attempt for a restraining order in San Francisco, on June 4, 2007, FLO filed a second lawsuit, in the United States District Court for the Eastern District of Arkansas ("the Arkansas Action"), against the Commission, seeking to enjoin the Commission from awarding the Little Rock contract to Verified. Verified was granted the right to intervene in the Arkansas Action on June 11, 2007.

26.     On June 12, 2007, a hearing was held in the Arkansas Action, and the court dismissed the case on jurisdictional grounds. After this hearing, I agreed to meet with Glenn Argenbright, FLO's President, who was clearly concerned about Verified's position that it would

sf-2354558 v1

seek reimbursement for all legal fees resulting from these groundless lawsuits. Verified subsequently agreed not to seek legal fees from FLO under California's trade secret statute for FLO's bad faith litigation in return for FLO ceasing all such litigation and acknowledging that our company's conduct has been lawful and honorable at all times. Specifically, the parties agreed to cessation of the California Action and the Arkansas Action with a dismissal with prejudice by FLO of all claims alleged against Verified in the California Action, no payment of money by Verified, and a waiver by FLO of all appeal rights from the dismissal of the Arkansas Action. Over the next day the parties finalized the settlement and on June 14, 2007, a settlement agreement was signed (the "Settlement Agreement"). A true and correct copy of the June 14, 2007, Settlement Agreement is attached hereto as Exhibit G.

27. As a result of the proceedings in the California and Arkansas Actions, FLO was put on notice, if it was not previously aware, of Mr. Fischer's misconduct (described in paragraphs 18 and 21 above), while acting in his capacity as Senior Vice President for FLO. Saflink and FLO senior management reviewed the transcript of statements made by Mr. Fischer during the April 11 Hearing and the audio tape of Mr. Fischer's comments in the April 23 telephone conference. After I recounted to Mr. Argenbright the repeated misconduct of Mr. Fischer, Mr. Argenbright apologized for it and said that Mr. Fischer "was sometimes an unguided missile, but we will control him." Neither FLO nor Saflink, however, has restrained Mr. Fischer.

**Fred Fischer's Unauthorized Access and Use of Verified's Proprietary Database**

28. In early July, 2007, I learned that Mr. Fischer, on behalf of Saflink and FLO, used Verified's confidential and proprietary information to solicit the contacts in our Salesforce Database, described in paragraph 7, above. Saflink first sent an e-mail to contacts in our Database in early July, giving them an opportunity to opt-out of Saflink's mailing list. Then about a week later, on July 10, 2007, these same persons were sent an advertisement offering a 35% discount if they entered into "a non-binding letter of intent" with Saflink by July 20, 2007,

and advising them to contact Fred Fischer at FLO Corporation. On that day, July 10th, we received several e-mails from persons in our Database forwarding the solicitation they had received. An example of one such email is attached to the Beer Affidavit as Exhibit D.

29. These emails were sent after Verified sent Mr. Fischer the May 22, 2007 registered letter.

30. It was evident that these e-mails were sent using contacts listed in our Database, as several of the recipients who contacted us were people that, although in Verified's Database, have no reason to be solicited by FLO or any other Registered Traveler competitor. A prime example is that FLO's e-mails were sent to a good friend — the maid-of-honor — of our Senior Vice President of Corporate Development, Allison Beer. This friend lives in Canada, has no relation to the aviation, airline, or Registered Traveler industry, FLO, Saflink, or any employer likely to be solicited for the Registered Traveler program in the United States. Her personal contact information is among the few personal contacts included by Ms. Beer in the Database for her convenience. There is no legitimate reason why FLO would include her in a solicitation.

31. Some of the other persons solicited by FLO, whose contact information FLO could only have obtained from our Database, include one of our outside lawyers, an independent contractor and lobbyist for Verified, an internal contact from one of our partners at Lockheed Martin, a staffing provider, a subcontractor for Verified, and even a Verified employee. The contact information for these individuals is not publicly available and would be extremely difficult, if not impossible, for someone to locate. None of these individuals received e-mails from Saflink prior to Mr. Fischer's employment with FLO. It thus appeared that our Database was being used to solicit business for FLO, as e-mails were being indiscriminately sent to persons in the Database.

32. These July 10, 2007, e-mails were sent by a Kevin Mitchell from an entity called the Business Travelers Coalition. The e-mail asks those solicited to contact Fred Fischer at FLO. On its home page, www.businesstravelcoalition.com, is a link to FLO Corporation's website. A

true and correct copy of the home page for the so-called Business Travel Coalition is attached hereto as Exhibit H.

33. After learning of these e-mails that were sent to the contacts in our Database on July 10th, I immediately called FLO President Glen Argenbright. I left him two voicemail messages urging him to call me. One voicemail specifically noted Mr. Fischer's misconduct. I expected Mr. Argenbright would respond immediately, but he has not returned my calls.

34. After the July 10th e-mailing, we immediately started investigating how FLO and Saflink were able to obtain our contacts for its own solicitations. We learned from reviewing Fischer's electronic profile in our system that Mr. Fischer accessed the Database on his last day of employment, December 5, 2006, and further attempted to access the Database on 1/31/2007, on 4/6/2007 (during the Little Rock bidding process); on June 12, 2007, the very evening that we were negotiating with Saflink and FLO for the settlement of the California and Arkansas Actions, in which Mr. Fischer's wrongful conduct was a significant issue, and on June 29, 2007. Saflink and FLO had clearly not done anything to "control" Mr. Fischer.

35. After our internal investigation revealed Mr. Fischer's log entries on the Database, we hired Kroll Ontrack, Inc. to perform a computer forensic analysis to determine the extent of Mr. Fischer's intrusion into our system and what Mr. Fischer accessed, and to assess and remediate any damage to the system and to implement remedial safeguards to the system, as a result of Mr. Fischer's unauthorized access.

36. As Alan Brill's Affidavit reveals, the forensic analysis shows that on Mr. Fischer's last day of employment at Verified, Mr. Fischer remotely logged on to the Database at 9:20 a.m. and exported our contacts from the Database into an excel spreadsheet. Indeed, it seems clear that while Mr. Fischer seldom thought he needed to log on to the Sale Force Database while he was employed by us, in the last hours of his employment he felt compelled to do so remotely, and to download all contacts contained within it.

37. We also learned that Mr. Fischer repeatedly tried to gain access to the Database after he was terminated on the dates reflected in the log. To date it appears that none of these

attempts were successful, but we can't know for sure. As a result of Mr. Fischer's misconduct, we have sustained a loss in excess of $5,000, in costs for the work performed by Kroll.

**Verified Will Be Irreparably Harmed if Fischer and His Employer Are Not Enjoined**

38. Verified will be irreparably harmed if Mr. Fischer, FLO and Saflink are not enjoined from their unfair competition and wrongful conduct. The information accessed and used by Mr. Fischer and his employer is highly valuable and commercially sensitive information. Verified has expended considerable time and money in developing relationships with key decision makers within the nation's airports, and with our strategic partners. In this new industry these relationships are crucial to our ability to compete, and ultimately to our survival in this emerging new field.

39. The unfair competitive advantage gained by FLO, Saflink, and Mr. Fischer, from the theft and use of our confidential and proprietary information would be extremely difficult, if not impossible, to quantify, and no monetary amount would be sufficient to compensate Verified for the loss of reputation, goodwill and competitive business opportunities.

40. More important, because we operate in the extremely sensitive field of airport security, our reputation as a trustworthy and security conscious company, and the integrity of our computer systems, is critical to our success. We currently enjoy an excellent reputation in the field. If Mr. Fischer is not enjoined from his conduct of using Verified's confidential information to FLO's advantage, and repeatedly attempting to hack into our computer system, this will significantly undermine our reputation as a company integrally involved in the security of the nation's airports, and severely damage our relationship with airports, travel partners, and within the industry.

_____
Steven Brill

Sworn to before me this
18th day of July, 2007

_Velma Howell_
Notary Public

VELMA HOWELL
Notary Public, State of New York
No. 01HO6022900
Qualified in Bronx County
Commission Expires April 12, 20 11