UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
VERIFIED IDENTITY PASS, Inc., d/b/a CLEAR : No. 07 Civ. 6538 (JGK)
REGISTERED TRAVELER, :
  :
                    Plaintiff, :
  : DECLARATION OF FRED
                    v. : FISCHER
  :
FRED FISCHER, SAFLINK CORPORATION, :
and FLO CORPORATION :
  :
                    Defendants. :
------------------------------------------------------------------x

      FRED FISCHER, declares:

      1.    I am a Senior Vice President of FLO Corporation ("FLO"), a Seattle-based company now competing with Verified Identity Pass, Inc. ("Verified") in the rapidly maturing market for "Registered Traveler" biometric cards that expedite entry through airport security. I respectfully submit this affidavit in response to Verified's application for a temporary restraining order. Unless stated otherwise, I have personal knowledge of the matters stated herein.

      2.    I have spent my entire 30-year career in the travel-services industry. For a one-year period (December 5, 2005 to December 5, 2006) I headed Verified's efforts to market "Registered Traveler" ("RT") cards to major corporations, airlines, hotels and other travel-industry vendors that might either buy or help promote Verified's RT cards. Since March 26, 2007, I have headed FLO's efforts to similarly market its RT cards to potential buyers and promoters. Verified and FLO are the leading players in the RT market and each is the strongest competitor of the other.

3. In its complaint Verified alleges that I have misused confidential and proprietary "trade secret" information stored in Verified's "Salesforce Database" and (on four occasions) attempted to wrongfully access that Database. Verified's allegations are altogether false. Its complaint is a transparent attempt to suppress competition at a time acutely important to the burgeoning RT-card industry.

4. As I further explain below, Verified's assertions that I have misused proprietary "trade secret" information are untrue and seriously mischaracterize the nature of the information in question. The information claimed by Verified to be "trade secret" is anything but that. It is simply a list of names and contact details of persons of natural interest to any company seeking to develop an RT-card business—Government officials, Senators and Congressmen, airport officials, and the individuals at major corporations responsible for travel services.

5. I have appended as Exhibit A what I understand to be the principal focus of this lawsuit. It is a list (the "List") of 174 names from a portion of the "Salesforce Database" ("Database") that Verified claims I wrongfully printed out on December 5, 2006. As I further explain below, it was entirely appropriate for me to print the List on that date. My Verified password gave me authorized access to the "Salesforce.com" site and the terms of my departure contemplated that I would continue to assist Verified's marketing efforts during a 30-day severance or transition period, and perhaps work on future projects. No one at Verified suggested that I should no longer make use of the Database or print the names I had added to the Database.

6. Not only does the List I printed show that Verified's description of the Database as the repository of proprietary trade-secret information is vastly overblown and wrong, but *I*

supplied virtually all the names for which I had responsibility (108 in total) based on the industry contacts gained before I joined Verified. (*See* the "FFisc" code on the right-hand column of pages 2-5 of Ex. A.) As I also explain below, I learned only *4* of those names after starting with Verified. The implicit suggestion that while at Verified I mainly tapped sources provided by Verified is complete fiction. And I have not given that printout (innocuous as it is) to FLO or anyone else, nor have I used it.

7. When I started with Verified in December 2005, there was no Database or any systematic process to identify and manage customer relationships. A number of months after I started, I believe in mid-year 2006, Bates Gregory, a young sales assistant, suggested we try the web-based customer-relationship-management software from www.Salesforce.com to handle customer relations more efficiently. We started to use the Salesforce.com site, but the efforts to that end during my tenure at Verified were limited. While I initially provided names and contact information known to me to get the Database started, I personally rarely if ever used it in the course of day-to-day business. In particular, I never used the Database to memorialize discussions or meetings with potential customers or share information with Ms. Gregory or others.

8. It is important to realize there is nothing remotely confidential or proprietary about the names and/or contact details of the companies that comprise the targeted customer base, *i.e.*, the major corporations likely to have substantial interest in RT cards and services. Mr. Brill suggests that the Database contains information "that is not publicly known," such as the "names and contact information for key decision makers" at "major travel companies" who might have become Verified's strategic partners and at "major corporations who purchase travel

service employees for their employees." (*See* Brill Aff. ¶ 7.) But as the List that I printed out reveals, this is humbug.

9. Anyone working at senior levels within the travel-services industry can identify the travel managers responsible for RT business at the major corporations with minimal effort. Name any major company, for example, and I or any other experienced sales manager would have little or no difficulty quickly finding out whom to contact to market RT cards or build an RT-card partnership. Any competent sales manager could compile a list of the senior travel managers of the Fortune 500 companies in a short period even if those persons were wholly unknown to him when he started. Moreover, one has simply to join an industry association such as the National Business Travelers Association ("NBTA") or the Association of Corporate Travel Executives ("ACTE") to obtain a membership roster that includes the contact details of the entire membership. As I further explain below, a majority of the names and/or the travel managers of the corporations on the Verified Database could be drawn from the NBTA and ACTE rosters.

10. What is important is the RT *product* sold, not the universe of easily identifiable major corporate buyers of the product. I have also read Mr. Brill's assertions that he discussed with me the confidential nature of the information on the Database. (*See* Brill Aff. ¶ 8.) That is not true. I have never had any conversation with Mr. Brill concerning the Database or the need to protect information in it.

11. What is more telling is Mr. Brill's statement that "key travel industry players (such as airlines, hotel chains, rental car companies, and credit card providers) are *right now* making key decisions about alliances that will shape the industry and affect the fortunes of

companies like ours for years to come." (Brill Aff. ¶ 8.) It is no secret who the key travel industry players are. Everyone knows the major airlines, hotel chains, rental car companies, credit-card providers and major corporations most interested in RT cards and services. By seeking to prevent FLO from contacting such companies, Verified wants to suppress competition, not protect any existing interest of Verified. And Mr. Brill's actions are perhaps not surprising. I frequently heard him say he would crush any competitor, specifically including FLO.

12.  I also deny having made any effort to deliberately access Verified's Database on the four occasions alleged by Verified (January 31, 2007, April 6, 2007, June 12, 2007, and June 19, 2007). (*See* Brill Aff. ¶¶ 34-37, Beer Aff. ¶ 12, and Beer Aff. Ex. A.) I have no recollection of ever clicking on Salesforce.com after I left Verified, either intentionally or accidentally. I understand, however, that Verified's records indicate I may have done so. (Beer Aff. ¶ 12 and Beer Aff. Ex. A.) If this happened, it would have been accidental.

13.  Since the time when I worked at Verified, the tool bar on my laptop computer has included an icon for Salesforce.com. It was put there at a time when Verified expected to make use of the Database that it planned to build. The tool bar appears on my laptop screen as shown on appended Exhibit B. When I later added the Saflink icon to the tool bar on my computer, it appeared next to the Salesforce.com icon. I believe that having initially (in 2006, when I worked at Verified) entered my username and password to access Verified's Salesforce.com account, any inadvertent click on the Salesforce.com icon on my computer (in 2007) would automatically cause the Salesforce.com server to try to log me onto the Verified account using the same username and password that was saved in my computer's memory. As Verified's papers show (Beer Aff. Ex. A), on the four dates in question my user code was inactive. If I clicked on the

"Salesforce.com" icon on those dates, I could not (and did not) gain entry to the Database. I suppose I could have deleted the Salesforce.com icon from the tool bar on my laptop, but having stopped using it I never thought to do so.

14. In all events I did *not* seek on those dates or any other dates to access Verified's Database for any unauthorized purpose. Nor have I ever tried to "hack" into Verified's computer systems. It is disturbing in the extreme for Verified nonetheless to allege—for the purpose of gaining unfair anti-competitive advantage—that I have violated the Federal "Computer Fraud and Abuse Act" when I have not improperly accessed Verified's computer systems in any way.

## My Background in the Travel-Services Industry

15. I am 50 years old and have spent my entire career in the travel-services industry. From the late 1970s until the mid-1980s I worked for a number of travel agencies and Laker Airways. From 1986 to 1996 I worked for Eastern Airline's computer division and later for U.S. Airways selling airline reservations systems. From 1996 to 2003 I worked for American Express, first as a technical support manager, later as director of corporate-card sales, finally as a vice-president of global-travel sales. My years building American Express's premier corporate-card business, including my work for global travel sales, are important. While at American Express I gained wide acquaintance with the travel managers and travel-support executives of countless companies both large and small throughout the United States. I brought that broad-based industry experience *to* Verified; I did not acquire it *from* Verified during the brief one-year period (December 2005 to December 2006) that I worked there.

- 6 -

16. In addition for the past 20 years I have been a member of the NBTA, the travel-services industry's leading trade association. The NBTA is comprised of approximately 1,300 direct members, *i.e.*, the travel managers of the U.S. corporations with the largest travel budgets, and thousands of other allied members who work for airlines, rental-car companies, credit-card companies, travel agencies, and countless other businesses that supply travel and travel-related services. (The NBTA hosted its annual meeting last week in Boston, MA, with roughly 6,300 members attending.) My affiliation with the NBTA has likewise given me a broad-based acquaintance with the travel-services managers of scores of major corporations across the United States.

17. After leaving American Express I worked briefly with World Travel Partners in Atlanta and then with SITA, the world's leading service provider of IT solutions and communication services for the air transport industry. In the fall of 2005 I left SITA to work for Verified. I started on December 5, 2005 as Senior Vice President of Strategic Sales. One should not be misled by that title. But for me, there was no "strategic sales" department or division. For a brief period (April 2006 to September 2006) I was assisted by Bates Gregory, a recent college graduate (I believe in 2003) with little travel-industry or sales experience, but otherwise I was the only one who marketed Verified's RT-cards to major corporations and other travel-industry vendors. I remained in that position until my employment was terminated as of December 5, 2006. While Verified kept open the possibility that I might still work on discrete projects, as matters developed I never did so. I became a Senior Vice President for FLO starting on March 26, 2007.

### The Rapidly Developing RT Business

18. Some industry background is in order. Verified was organized in 2004 as a start-up company seeking to take advantage of the RT program proposed in the aftermath of 9/11 by the Transportation Security Administration ("TSA"), part of the Department of Homeland Security. FLO was created for a similar purpose by Saflink Corporation ("Saflink"), a leading encryption-technology provider.

19. The RT program allows individuals who have been pre-approved by the TSA to pass through airport-security lanes supervised by a TSA-approved, RT-certified contractor. The TSA-approved RT provider issues a so-called "smartcard" (the approximate size of a credit card) encrypted with biometric data identifying the cardholder's physical features (fingerprint and iris scan). By presenting that card at an airport terminal the TSA-approved cardholder gains expedited access through airport security.

20. The RT business is divided into two parts. On one side of the business an RT provider such as Verified and FLO contracts with airport authorities and/or airlines to operate RT lanes at airport terminals. On the other side of the business the RT provider contracts with large users of travel services to provide RT cards to their employees and with companies (such as the major rental car companies and credit card issuers) able to market RT-branded services. Card-holders (or their employers) pay an annual fee to the RT provider issuing the RT cards. I work on this latter side of the business, growing RT card volume and card-based revenue.

21. The RT card is not an esoteric product of interest only to a few hard-to-locate businesses or individuals. Everyone can understand a card that lets you move through airport

lines faster. Any company whose employees travel is a potential corporate customer. Obviously major companies, and travel-services providers, are the prime market for the RT cards. The companies are not hard to find. Providing the right sales presentation to them is what matters.

22. There are five companies competing today to provide RT services. Verified and FLO (in collaboration with Unisys Corporation, a leading provider of IT security services) are the most prominent.

23. As discussed below, the competition between these companies is intensifying. More and more airports are contracting for RT services and more and more major companies are seeking RT cards for their employees. Although Mr. Brill suggests that FLO has not yet gained much ground, FLO's teaming with Unisys is without question Verified's strongest competition. Only FLO and Verified, for example, made oral presentations yesterday (July 30, 2007) to the Washington D.C. airport authority. Indeed, the filing of this action immediately ahead of those presentations reveals the anti-competitive motives behind the action.

24. The RT business, slow to get started, is now advancing swiftly. When I joined Verified, the TSA had approved only a single pilot RT program at the Orlando, FL airport. Approvals for other airports, including Cincinnati, OH, Indianapolis, IN, and San Jose, CA, were delayed. Although promised for some time, the TSA did not issue RT program guidelines until January 2007. Today, however, 9 airports and/or airline-managed terminals feature RT lanes. Up to 25 airports and/or terminals are expected to offer RT services by the end of 2007. Perhaps 25 more are expected to so by the end of 2008. And the total number of RT cardholders, quite small today, will grow exponentially over the next 12 to 18 months.

## My Position at Verified

25.     I was hired by Verified in December 2005 to develop the company-contract side of its RT business. Mr. Brill describes my position as that responsible for Verified's sales and marketing strategy for corporate sales and strategic partnerships—selling bulk employee memberships to major corporations and arranging co-marketing partnerships with major travel-industry corporations—and that is basically correct. (*See* Brill Aff. ¶ 4.) I did not market Verified to airports; I focused on the sale and development of RT cards (as I am now doing with FLO). It is also revealing that Mr. Brill correctly describes Verified's interest in developing relationships with *major* corporations. There is nothing confidential or proprietary about the travel-services managers or the travel-management practices of the major corporations that can be solicited by any RT provider. And before I arrived, Verified did not have an RT-card contract with any major corporation.

26.     Mr. Brill suggests that Verified introduced me to its business contacts, partners, and customers, but that is not true. Before I joined Verified its efforts to develop contacts with the major companies interested in RT-card services had been quite limited. Its sales manager, Allison Phinney Beer, a recent college graduate new to the travel-services business (and classmate of Bates Gregory), had concentrated on the airport side of the business (and continued to do so after I arrived). In contrast, I brought to Verified the wealth of industry contacts built up over the many years spent in the travel-services industry, which is what made me attractive to Verified in the first place.

### Kevin Mitchell and the Business Travel Coalition

27.     Before my arrival Verified had engaged the services of Kevin Mitchell, a leading industry consultant. Mr. Mitchell heads Business Travel Coalition, Inc. ("BTC"), and manages the most prominent online travel-industry website, http://www.businesstravelcoalition.com. Mr. Mitchell had started to provide consulting services to Verified in April 2005 and continued to do so until April 2006. (I learned of the sales position at Verified as a result of an executive-search notice distributed by BTC, although I did not personally know Mr. Mitchell before starting with Verified in December 2005.) I understand from Mr. Mitchell that BTC's database currently consists of over 10,000 individuals or companies.

### The Printout of Part of the Database on December 5, 2006

28.     It is altogether wrong for Verified to suggest that I improperly downloaded the Database on December 5, 2006. What actually happened is that on Monday December 4, 2006, after I returned to the office from a two-week holiday, Mr. Brill told me that Verified would terminate my employment as of December 5, 2006, the one-year anniversary of my start there. Mr. Brill said there would be a 30-day severance or transition period during which I would continue to share information concerning what I had done for the company. He also said that Verified would still honor the stock option (8,333 shares) vesting on December 5, 2006 (although it has not yet done so). Following that conversation I returned to my home in Winston Salem, NC.

29.     On Tuesday December 5, 2006 I had a follow-up conversation with Cindy Rosenthal, Verified's press officer who also manages its IT. She confirmed the transition-period outlined by Mr. Brill. As a result of my conversations with Mr. Brill and Ms. Rosenthal, I copied

(from my laptop screen) the List of my contacts, expecting to have further conversations with Verified concerning those names known to me. (*See* Ex. A, with the print date on the bottom right corner of the 6-page printout.) I did not download any information from the Database into my laptop (provided by Verified) or any other computer, either on December 5, 2006 or any later date. Nor have I provided the List to anyone, or actually used it.

30. Although I was interested only in the names related to my work (the 108 names beginning at the bottom of page 2 and ending at the top of page 6, next to my "FFisc" code), I printed the first six pages because it was easiest for my purposes to do so. I did not print following pages that would have included the names of interest to others (for example, Bates Gregory and Allison Beer). I do not have copies of any "comments" memorializing customer contacts such as Ms. Beer suggests (Beer Aff. ¶ 5), nor was it my practice at Verified to record or make use of such comments.

31. The first 64 individuals on the printout (the responsibility of Robert Cimino, who helped manage the airport side of Verified's business) are officials at U.S. Government agencies (a total of 18), Senators and Congressmen (21), executives at airline authorities (18), public relations firms (7), and law firms (1). There is nothing the slightest bit confidential or proprietary about such names and contact details.

32. The next 108 individuals (my contact responsibility) are comprised for the most part of senior executives at major airlines (*e.g.*, Virgin, Continental, JetBlue, AirTran), credit card companies (*e.g.*, American Express, Visa, MasterCard), financial institutions (*e.g.*, Merrill

Lynch, Bank of America, Credit Suisse First Boston), hotels (*e.g.,* Hyatt, Ritz), rental car companies (*e.g.,* Hertz, National) and other large corporations.

33.     Not only is the bare-bones contact information of those individuals on the printout generally available, but the second part of the list is comprised almost entirely of individuals or companies known to me when I joined Verified. Verified provided only *one* of the names on the List when I joined Verified, *i.e.,* Dean Sivley, the COO of Cendant Corporate Travel Solutions. Only *three* names came to my attention (as a result of my efforts) during my year at Verified, *i.e.,* James Benoski (Cincinnati Financial), John Aitken (San Jose Airport), and Kevin Healey (AirTran Airlines). All the other persons are the fruit of the industry knowledge that I brought to Verified.

34.     As noted, I would not have had the slightest difficulty identifying Mr. Sivley myself. Verified did not have any contract with Cendant (the owner of Orbitz, the web-based company) and merely giving me his name conveyed no confidential information. Verified's public-relations firm for the Cincinnati area identified Mr. Benoski. I have not had any contact with him since joining FLO and have no plans to do so. I have similarly had no contact with Mr. Aitken and no plans to contact him. And Mr. Healey's name was provided by Mr. Mitchell.

35.     Furthermore, the ready availability of the contact information of the 108 names on the second part of the printout is evident if one simply compares those names and the NBTA and ACTE rosters. For example, of the 108 names in question, 83 or 78% can be derived from the NBTA and ACTE rosters for 2006 [31 are on the NBTA direct members list, 6 are on its allied members list, 17 companies (with other names) are otherwise on one of the lists, and 32 indivi-

duals or firms are on the ACTE roster]. (I have appended as Ex. B and C relevant pages of the rosters.) In addition, this list of 108 names does not include all my industry contacts. It represents perhaps 25% of the total number of significant industry contacts that I have built up over the years.

### My Laptop Computer

36. Though aware that I had a Verified laptop on which I stored company information, Ms. Rosenthal did not on December 5, 2006 or any later date ask me to return the laptop or delete any Verified information on it. Nor did Ms. Rosenthal or anyone else at Verified suggest that I return or destroy hard copies of any Verified documents in my possession. Indeed, not on December 4th, December 5th, nor any later date did anyone from Verified tell me I should not access the Database during the post-departure transition period. All that happened is that Verified at some point deactivated my access to its email network and the Database at Salesforce.com.

### My Continued Assistance to Verified in December 2006 and January 2007

37. That Verified understood and expected that I would continue to share contact information is evident from numerous telephone and email communications with Verified representatives after December 5, 2006. These communications further confirm that it was appropriate for me to have in hand the contact information from the List printed on December 5, 2006.

38. For example, on December 14, 2006, Courtney Nicholls, Verified's COO, sent me an email message asking me to provide "the contacts at our strategic partners so that we can follow up". *See* appended Ex. D. Ms. Nicholls's request confirms that Verified was not in the

habit of providing me with contact information, but rather that I provided such information to Verified. In that message Ms. Nicholls also inquired whether I would be "interested in continuing to work on specific accounts." That request confirms that Verified was still considering retaining me for specific customer-related projects. In my reply early that afternoon, I said I had remained in constant contact with Bates Gregory and that "[d]epending on my next career choice, I am still interested in continuing to work on specific projects in the future."

39. On December 20, 2006, Ms. Gregory sent me an email message stating that "[w]e are trying to get a handle on hotel partnerships. Will you send us your contacts at Wynn, Starwood, MGM and Four Seasons? Also, was Raj replaced at Starwood?" *See* appended Ex. E. That request likewise confirms the contact information for major hotel corporations was not Verified's but rather mine.

40. On January 19, 2007, Ms. Gregory sent a further message asking for "all of the contacts you were working with on the P&G deal" and on January 25, 2007, Allison Beer sent a similar message. *See* appended Ex. F.

41. Finally, Ms. Nicholls called me on January 29, 2007 to follow up on Ms. Gregory's request that I provide names at Procter & Gamble and other companies that might be interested in partnering with Verified to provide card-related travel services. In her voice-mail message, Ms. Nicholls implied that my not providing this information might affect the company's willingness to honor the stock options due me.

42. Despite that thinly veiled threat, on January 30, 2007 I emailed the requested information to Ms. Nicholls (2 individuals at Procter & Gamble and a further 14 individuals at

- 15 -

large corporations such as Marriott, Hilton, Hyatt, Expedia, and Travelocity). *See* appended Ex. F. It is evident from that message that the Database did not contain the contact names of all potential strategic partners. I also provided (and Ms. Nicholls expected) only names and telephone numbers, which further dispels any suggestion such information was "trade secret." (In that message I told Ms. Nicholls that the corporate contacts were in Salesforce.com, also indicating that the Database was simply a roster of industry contacts.) I also asked that she send the terms of my separation, including my options letter, as discussed on my last day in the office, *i.e.*, December 4, 2006, but she did not do so.

### Starting with FLO

43.   When I stopped working for Verified in December 2006 I had not had any contact with FLO and did not know its senior executives. In January 2007 I made a "cold call" to FLO to explore possible employment there and left a voice mail message for Luke Thomas, its Executive Vice President. I eventually joined FLO as a Senior Vice President on March 26, 2007, based on my discussions with Thomas and FLO's President Glenn Argenbright. I am responsible for developing FLO's company-contract, not its airport business; another FLO executive, Colin McLaughlin, is responsible for FLO's airport business. Although Verified purports to attach importance to a presentation to the Little Rock Airport Commission, AR that I made together with Mr. McLaughlin, that it is the only presentation I have ever made to an airport authority. During that presentation I did not violate any confidence of Verified. My responsibilities, both at Verified and FLO, have concentrated for the greatest part on developing the customer-card side of the business.

- 16 -

### The Alleged Salesforce.com Contacts

44.  I have read the allegations that on four later occasions (January 31st, April 6th, June 19th, and June 29th) I attempted to invade Verified's Database. All that the purported forensic evidence shows is that I did *not* access the Database on the Salesforce.com server. (See Beer Aff. ¶ 12 and Beer Aff. Ex. A.) As noted above in paragraphs 12 and 13, it is possible that I inadvertently clicked on the Salesforce.com icon on the toolbar of the computer (provided by Verified which has not asked for it back). I did not deliberately try to access the Database on those dates.

45.  At no time has any FLO officer or employee suggested that I obtain any information from the Database or share with FLO any information proprietary to Verified.

46.  At no time have I provided to FLO or any FLO officer or employee any printout of the Database or any information derived from it.

### Mitchell, BTC and FLO

47.  Earlier this year I introduced Kevin Mitchell to FLO. For the last several months Mr. Mitchell has been acting as a consultant for FLO. I have not provided to Mr. Mitchell any confidential customer-contact information drawn from the Database. Nor have I provided confidential customer-contact information to Mr. Mitchell in connection with BTC's circulation of e-mail messages sent on July 5th, July 10th, and July 16th. (These email messages are Exs. C, D, and E to the Affidavit of Allison Beer.) Indeed, I did not provide any specific email contact information to Mr. Mitchell derived the List or Verified's Database.

### BTC's Three Email Distributions in July 2007

48.     As Mr. Mitchell will further explain, BTC distributed those three emails indiscriminately to persons and companies comprising certain segments of BTC's extensive database that (as I understand from Mr. Mitchell) includes more than *10,000* persons and/or companies. BTC's distribution of the three email messages in question has nothing whatever to do with Verified's Database or any alleged misuse of that Database. And while Verified repeatedly states in its papers that I, FLO or Saflink variously sent the emails, BTC alone sent the emails to a circulation base known to and controlled only by Mr. Mitchell.

49.     It is also relevant to consider just how innocuous these email distributions are. The July 5th email (Beer Ex. C) was sent to the "Aviation Security Journal" segment of BTC's subscription base (reportedly in excess of 10,000 addressees). It was a preview of an article written by Mr. Mitchell for the July issue of the Business Travel Executive magazine. The 4-page article (Beer Ex. F) generally describes the evolution of the RT program and how it works in practice. There is only a passing reference to FLO in the penultimate paragraph on page 2.

50.     The July 10th email message (Beer Ex. D) was circulated to the "Travelers Industry" part of BTC's subscription base (also reportedly in excess of 10,000 addressees). Mr. Mitchell sent that message in connection with the consulting services he is providing to FLO. The message simply informs the reader of a 35% sign-up discount offered by FLO before July 20, 2007, and invites the readers to call me for additional information.

51.     The July 16th email message (Beer Ex. E) was circulated to the same "Aviation Security Journal" subscription base as the July 5th message forwarding Mr. Mitchell's magazine

article. That message simply invites the reader to participate in a 7-minute survey that BTC was conducting on FLO's behalf.

52. None of these email messages can be said to have harmed Verified in any way.

53. Finally, there is no basis known to me for Verified's assertions that I provided to Mr. Mitchell the names of the 12 persons said to be on Verified's Database who are said to have received BTC's emails. (*See* Beer Aff. ¶ 17.) I have not provided those names to Mr. Mitchell or BTC and none of those names is on the December 5, 2006 List (Ex. A).

In accordance with 28 U.S.C. § 1746 I declare under penalty of perjury that the foregoing is true and correct.

July 31, 2007

_____
FRED FISCHER