MORRISON & FOERSTER LLP
Jamie A. Levitt
Damion K.L. Stodola
1290 Avenue of the Americas
New York, NY 10104-0050
(212) 468-8000
*Attorneys for Plaintiff Verified Identity Pass, Inc.*

Lori A. Schechter (*pro hac vice* pending)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
(415) 268-7000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VERIFIED IDENTITY PASS, Inc., d/b/a CLEAR REGISTERED TRAVELER,<br><br>Plaintiff,<br><br>-against-<br><br>FRED FISCHER, SAFLINK CORPORATION, and FLO CORPORATION,<br><br>Defendants. | No. 07 Civ. 6538 (JGK) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF VERIFIED IDENTITY PASS, INC.'S REQUEST FOR A <u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ I

I. DEFENDANTS' FACTUAL ASSERTIONS FAIL TO REFUTE THE CLAIMS. ........ 1

II. DEFENDANTS' CFAA INTERPRETATION IS BELIED BY THE CASE LAW. ........ 4

A. Civil Actions Can Be, and Have Been, Maintained Under Sections 1030(a)(2)(C) and (a)(4) of the CFAA. ........ 4

B. Fischer's December 5, 2006 Actions Were Not "Authorized." ........ 5

C. Fischer's Attempted Hacking Violates Section 1030(a)(5)(A)(ii)-(iii). ........ 6

D. Verified Has Pled "Loss" As Required Under Section 1030(g). ........ 6

III. DEFENDANTS OFFER NO BASIS TO DECLINE SUPPLEMENTAL JURISDICTION OVER VERIFIED'S STATE LAW CLAIMS. ........ 7

IV. DEFENDANTS FAIL TO REFUTE THAT THE SALESFORCE INFORMATION DOWNLOADED BY FISCHER IS A TRADE SECRET. ........ 8

V. DEFENDANTS FAIL TO REFUTE IRREPARABLE HARM. ........ 9

VI. THE RELIEF SOUGHT IS APPROPRIATE ........ 10

# TABLE OF AUTHORITIES

## CASES

*Borough of W. Mifflin v. Lancaster*,
45 F.3d 780, 789 (3d Cir. 1995)....7

*B.U.S.A. Corp. v. Ecogloves, Inc.*,
No. 05 Civ. 9988 (SCR), 2006 U.S. Dist. LEXIS 85988 (S.D.N.Y. Jan. 31, 2006)....8

*Charles Schwab & Co. v. Carter*,
No. 04 C 707, 2005 U.S. Dist. LEXIS 21348 (N.D. Ill. Sept. 27, 2005)....5

*Civic Center Motors*,
387 F. Supp. 2d 382 (S.D.N.Y. 2005)....7

*Dunlop v. City of N.Y.*,
2006 WL 2853972 (S.D.N.Y. Oct. 4, 2006)....8

*E.F. Cultural Travel B.V. v. Explorica, Inc.*,
274 F.3d 577 (1st Cir. 2001)....5

*Fiber Sys. Int'l. Inc. v. Roehrs, et al.*,
470 F.3d 1150 (5th Cir. 2006)....4

*Four Seasons Hotels and Resorts BV v. Consorcio Barr, S.A.*,
267 F. Supp. 2d 1268 (S.D. Fla. 2003)(ii)....6

*Garland-Sash v. Lewis*,
05 Civ. 6827, 2007 U.S. Dist. LEXIS 20909 (S.D.N.Y. Mar. 26, 2007)....5

*George S. May v. Hostetler*,
04 Civ. 1606, 2004 U.S. Dist. LEXIS 9740 (N.D. Ill. May 28, 2004)....5

*Hewlett-Packard Co. v. BYD:sign, Inc., et al.*,
Cause No. 6:05-CV-456, 2007 U.S. Dist. LEXIS 5323 (E.D. Tex. Jan. 25, 2007)....5

*I.M.S. Inquiry Management Systems, Ltd. v Berkshire Information Systems, Inc.*,
307 F. Supp. 2d 521 (S.D.N.Y. 2004)....4

*Int'l Airport Ctrs., L.L.C. v. Citrin*,
440 F.3d 418 (7th Cir. 2006)....5

*Laro Maintenance Corp. v. Culking*,
681 N.Y.S.2d 79 (2d Dep't 1998)....8

*Markowitz v. Serio*,
39 A.D.3d 247 (N.Y.A.D. 1st Dept. 2007) ..........9

*N. Atlantic Inst. v. Haber, et al.*,
188 F.3d 38 (2d Cir. 1999) ..........8

*Nexans Wires S.A. v. Sark-USA, Inc.*,
319 F. Supp. 2d 468 (S.D.N.Y. 2004) ..........6

*P.C. Yonkers, Inc. v, Celebrations the Party & Seasonal Superstore, LLC*,
428 F.3d 504 (3d Cir. 2005) ..........4

*Physicians Interactive v. Lathian Sys., Inc.*,
A-03-1193-A, 2003 U.S. Dist. LEXIS 22868 (E.D. Va. Dec. 5, 2003) ..........5

*Rothberg v. Chloe Foods Corp.*,
No. CV-06-5712 (CPS), 2007 WL 2128376 (E.D.N.Y. July 25, 2006) ..........7, 8

*SST Global Tech., LLC v. Chapman*,
270 F. Supp. 2d 444 (S.D.N.Y. 2003) ..........8

*Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage*,
119 F.Supp.2d 1124 (Date) ..........5, 6

*Theofel v. Farey-Jones*,
359 F.3d 1066 (9th Cir.2004) ..........4

*Tyco Int'l (US), Inc. v. John Does, 1-3*,
01*Civ 3856 (RCC) (DF)*, 2003 U.S. Dist. LEXIS 11800 (S.D.N.Y. 2003) ..........6

*Universal Marine Medical Supply, Inc. v. Lovecchio*,
8 F.Supp.2d 214 (E.D.N.Y. 1998) ..........9

## STATUTES

18 U.S.C. § 1030 (g) ..........4

28 U.S.C. § 1367 ..........7, 8

S. Rep. No. 104-537 at 7-8 ..........5

Defendants' Opposition papers are striking for two distinct reasons: they fail to refute, or even to address, the existence of significant *facts* supporting Verified's claims on the merits and entitlement to injunctive relief, and they ignore the *case law* that disposes of their reading of the Computer Fraud and Abuse Act. The record before this Court clearly demonstrates why a TRO and expedited discovery should be granted.

## I. DEFENDANTS' FACTUAL ASSERTIONS FAIL TO REFUTE THE CLAIMS.

The declarations defendants offer fail to refute a number of critical facts presented by Verified's papers. Where they do attempt to refute key facts, the explanations do not hold water. The following points are illustrative, and demonstrate why expedited discovery of electronic evidence is essential.

- **The "List" Fischer admits he accessed on his last day of work (Ex. A to his Aff.) does not refute the forensic evidence that Fischer *exported* far more information from the Salesforce Database.**

Fischer's "List" is merely what Fischer says he *printed* from Salesforce on his last day. Supplemental Affidavit of Alan Brill, Dated August 1, 2007 ("Kroll Supp. Aff.") ¶¶ 17. The 6 pages represent the last web page of ***809*** contacts that appeared when "All Contacts" were requested by Fischer on December 5. What Fischer *printed* says nothing about what Fischer *exported* to his computer by using the .csv command that retrieved 14 data fields as reflected in the log files. *Id.* ¶¶ 18-20.

- **Defendants do not even try to explain Mr. Fischer's four attempts to access the *Verified network* on February 20, 2007, as opposed to the Salesforce Database.**

*See* Kroll Supp. Aff ¶ 4; Supplemental Affidavit of Allison Beer, Dated August 1, 2007 ("Beer Supp. Aff.") ¶¶ 3-4. These attempts to access the Verified network were made after Fischer admits he was no longer doing any work for Verified. Fischer Aff. ¶ 5. There was no legitimate reason for these attempts and his conduct cannot be explained away by his claim that he accidentally clicked on the salesforce.com icon on his computer. Kroll Supp. Aff. ¶ 5. The

Verified system requires multiple keystrokes before a computer will register as an unsuccessful attempt to access, as the logs reflect here. Kroll Supp. Aff. ¶ 4; Beer Supp. Aff. ¶¶ 3-4.

- **Defendants' explanation for Fischer's repeated attempts to access the *Salesforce Database* in 2007 stretches credulity.**

Even if Fischer had a Salesforce.com icon on his laptop long after his employment at Verified, it would still normally be necessary for him to go through the process of entering a password, and possibly a user ID and clicking on the "submit" button before a record would be created of his attempted access. Kroll Supp. Aff. ¶¶ 5-13. While it might be possible to build a special, customized icon to avoid this process, Fischer never claims that he did, only that he believes that having logged on "initially" and having entered his "username and password" that this would happen automatically. *See id.;* Fischer Aff. ¶ 13. If the forensic evidence ultimately shows that Fischer did have an icon for Salesforce and inadvertently launched it four times, he would have received an "access denied" message each time, alerting him to the issue. Why, then, did he not delete the icon at that time? Indeed, combined with the unrefuted four attempts to access the Verified computer system, Fischer's assertion, without more, should not be accepted without the benefit of the discovery process.[1]

- **Defendants have no explanation for why the 12 individuals listed in the Beer Affidavit — including Ms. Beer's maid of honor —received the emails Mitchell sent for FLO.**

Defendants' assertion that the only information Fischer took from Verified was his 6-page "List" fails to explain how Mitchell ended up repeatedly emailing Verified's contacts, including the 12 identified in the Beer Affidavit — none of whom are included on Fischer's "List." Mitchell's Affidavit implies these 12 emails may have been given to him by Verified, claiming that when he consulted for Verified, Verified provided him with some "email and contact details

[1] Fischer did not furnish a picture of that icon, contrary to Fischer Aff. ¶ 13. As for the laptop itself, Fischer asserts that nobody asked him to return his "Verified laptop," Fischer Aff.. ¶ 36, but he was never issued a laptop by Verified. Beer Supp. Aff. ¶ 12.

of people it wanted to receive" his newsletters. Mitchell Aff. ¶ 7. However, Verified employees gave Mitchell only press contact information, and even Fischer did not have access to those emails to give to Mitchell when Mitchell consulted for Verified. Beer Supp. Aff. ¶ 10. Indeed, the email address for Vanessa Mazandi, the Verified employee who received the July emails, did not even exist until *after* Mitchell's consultancy terminated in April 2006. Affidavit of Vanessa Mazandi, Dated August 1, 2007 ("Manzandi Aff.") ¶ 5.

Equally incredible is Mitchell's notion that these 12 individuals — including Ms. Beer's maid of honor — could have subscribed to his website, a suggestion he makes without any substantiation. Mitchell would have a record if any of these individuals voluntarily subscribed, yet he produces no record. The evidence is to the contrary, as shown by the Affidavit of Vanessa Mazandi, a Verified employee who commenced employment well after Mitchell worked for Verified, and who came with absolutely no prior connection to the travel business. She received Mitchell's July emails despite the fact that she never subscribed to the website and her email address did not exist before August 2006. Mazandi Aff.. ¶¶ 2-5, Beer Supp. Aff. ¶ 11. The only plausible explanation is that Fischer gave Verified's contact information to Mitchell. In fact, Mitchell *admits* that Fischer "provided to [him] from time to time in his official capacity at Verified *and FLO* email addresses to include in BTC's various circulation databases." Mitchell Aff. at ¶ 2 (emphasis added).

- **Fischer's claim that he printed out only those contacts that he contributed to the Database in case he needed them to assist Verified during his severance period is nonsensical.**

To begin with, we know that's not what Fischer did. As his "List" reveals in the top left corner, he selected "All Contacts" rather than "My Contacts." Beer Supp. Aff. ¶ 14; Kroll Supp. Aff. ¶ 15. Equally important, Fischer would have had no need to download the Database to obtain "his contacts" or to help complete what he had been doing at Verified. Fischer asserts that he

"personally rarely if ever used [Salesforce] in the course of day-to-day business." Fischer Aff. ¶ 7. All of his information was in his own Contacts in Outlook. Beer Supp. Aff. ¶ 6. The claim that Fischer suddenly felt the need to download the Database on his last day of work when he never used it before, to get information that was already in his Outlook file, is preposterous.

## II. DEFENDANTS' CFAA INTERPRETATION IS BELIED BY THE CASE LAW.

Defendants' analysis of the CFAA is both strained and contrary to the prevailing case law in this District and among the Circuit Courts.

### A. Civil Actions Can Be, and Have Been, Maintained Under Sections 1030(a)(2)(C) and (a)(4) of the CFAA.

Defendants claim that, "when the statute is parsed," a plaintiff has no private right of action under any section of the CFAA except under Section (a)(5). Defendants' Memorandum Of Law In Opposition ("Opp. Brief") at 11. This argument has been rejected every time it has been raised before the Circuit Courts. *See, Fiber Sys. Int'l. Inc. v. Roehrs, et al.,* 470 F.3d 1150, 1157 (5th Cir. 2006) ("[A]lthough § 1030(g) refers to *subsection (a)(5)(B),* the statute does not limit civil suits to violations of § 1030(a)(5)....if Congress intended to limit civil actions in this manner, it could have simply provided that civil actions may only be brought for violations of *subsection (a)(5)*") (emphasis in original); *accord P.C. Yonkers, Inc. v, Celebrations the Party & Seasonal Superstore, LLC,* 428 F.3d 504, 512 (3d Cir. 2005).

By its terms, the CFAA allows civil claims based on allegations of *any* conduct prohibited by the Act so long as the alleged misconduct "involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)." 18 U.S.C. § 1030(g). Thus, "while the offense must involve one of the five factors in (a)(5)(B), it need not be one of the three offenses in (a)(5)(A)." *Theofel v. Farey-Jones,* 359 F.3d 1066, 1078 n. 5 (9th Cir. 2004).

At least two cases in this District have allowed civil claims to proceed under the provisions defendants challenge. In *I.M.S. Inquiry Management Systems, Ltd. v Berkshire Information*

*Systems, Inc.*, 307 F. Supp. 2d 521, 526 (S.D.N.Y. 2004), cited by defendants, the court let stand a claim under § 1030 (a)(2)(C). *See also Garland-Sash v. Lewis*, 2007 U.S. Dist. LEXIS 20909 (S.D.N.Y. March 26, 2007) (allowing claims under §§ 1030(a)(2)(B) and (a)(5)(A)(i)). This reading of the Act is consistent with numerous district court cases that have allowed private rights of action under other sections of the statute.[2]

**B. Fischer's December 5, 2006 Actions Were Not "Authorized."**

Fischer violated Sections 1030(a)(2)(C) and (a)(4) of the CFAA when he improperly accessed and exported the Salesforce Database on his last day of employment. Plaintiff's Brief at 15-16; Kroll Supp. Aff. ¶ 18-21; Beer Supp. Aff ¶ 13. Defendants argue that Fischer's access could not be "unauthorized" because he was still an employee and had the right to access the Database. Opp. Br. at 11. This reflects a fundamental misunderstanding of the statute.

Congress intended the CFAA to apply to "individuals who intentionally break into or abuse their authority to use, a computer." S. Rep. No. 104-537 at 7-8. Numerous cases have applied the statute to hold that an employee with a right of access is nonetheless "unauthorized" when the access is undertaken for an improper purpose.[3] Fischer's excuse that he needed to

---

[2] *See, e.g, Hewlett-Packard Co. v. BYD:sign, Inc., et al.*, 2007 U.S. Dist. LEXIS 5323, *40 (E.D. Tex. Jan. 25, 2007) (allowing claims under §§ 1030 (a)(2) and (a)(4)); *Charles Schwab & Co. v. Carter, et al.*, 2005 U.S. Dist. LEXIS 21348, *19 (N.D. Ill. Sept. 27, 2005) (§ 1030 (a)(2)); *Physicians Interactive v. Lathian Sys., Inc., et al.*, 2003 U.S. Dist. LEXIS 22868, *16-18 (E.D. Va. Dec. 5, 2003) (§§ 1030 (a)(2)(C) and (a)(4)).

[3] *See, e.g., Int'l Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418, 420-21 (7th Cir. 2006) (defendant employee's "breach of his duty of loyalty terminated his agency relationship…and with it his authority to access the laptop…"); *E.F. Cultural Travel B.V. v. Explorica, Inc.*, 274 F.3d 577, 582-84 (1st Cir. 2001)(employer was likely to prove access in "excess of authorization" when employee disclosed proprietary information to new employer); *Shurgard Storage Cntrs.*, 119 F.Supp.2d 1124 (employee acted without authorization when he took proprietary information from employer's computer to benefit new employer); *George S. May Int'l Co. v. Hostetler*, 04 Civ 1606, 2004 U.S. Dist. LEXIS 9740, *10 (N.D. Ill. May 28, 2004) (employees' "authorization did not extend to removing copyrighted material from the computer system for his own personal benefit or that of a competitor.")

download a database on his last day of employment that he "rarely if ever used," Fischer Aff. ¶ 7, and thought he could do so without permission, should be rejected out of hand.

Defendants are also wrong when they say Verified has failed to plead section (a)(4) because they have not pled "fraud or an intent to defraud." This is not the correct standard under § 1030 (a)(4). See, e.g. *Shurgard*, 119 F. Supp. 2d at 1126 (Stating that the proper standard for "fraud" under the CFAA "simply means wrongdoing and not proof of the common law elements of fraud."); *George S. May*, 2004 U.S. Dist. LEXIS at *11 (same).

**C. Fischer's Attempted Hacking Violates Section 1030(a)(5)(A)(ii)-(iii).**

Verified has also shown likelihood of success on the merits of its §1030(a)(5)(A)(ii)-(iii) claims against Fischer and FLO from Fischer's *eight* attempts to log on to Salesforce Database and Verified's Network after his termination. Defendants literally write the word "attempt" out of the statute by misquoting section (a)(5)(B), which specifically says "or, in the case of an *attempted* offense..." *Compare* Opp Br. at 10 ("or, in the case of an *interrupted* [sic] offense.") (Emphasis added); *See also Four Seasons Hotels and Resorts BV, et al v. Consorcio Barr, S.A.*, 267 F. Supp. 2d 1268, 1323 (S.D. Fla. 2003) (finding violation of 1030(a)(5)(A)(ii) and (iii) through numerous *attempts* to "intentionally access without authorization" plaintiff's computers) (emph. added).

**D. Verified Has Pled "Loss" As Required Under Section 1030(g).**

Finally, numerous courts have recognized the very type of "loss" that Verified has pled. The hiring of experts to assess the full extent of access and the potential damage caused thereby, and the cost of that investigation, constitutes loss under the CFAA. *See, e.g., Tyco Int'l (US), Inc. v. John Does, 1-3*, 2003 U.S. Dist. LEXIS 11800, at *4 (S.D.N.Y. July 11, 2003) (investigative costs are actionable if the investigations are to "assess the damage" to the system or re-secure the system, as opposed to track down the offender). Unlike the plaintiff in *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 474 (S.D.N.Y. 2004), *aff'd*, 166 Fed. Appx. 559 (2d Cir. 2006),

Verified is not seeking to be reimbursed for its lost profits or lost business opportunities . *Civic Center Motors. Ltd. v. Mason St. Import Cars, Ltd. et al.*, 387 F. Supp. 2d 378, 382 (S.D.N.Y. 2005).

Defendants claim that the loss is not recoverable because the experts were hired "only after learning that Mr. Fischer had *not* gained access" (Opp. Br. at 14) is unsupported and at odds with the facts. Verified hired experts because FLO has been soliciting contacts from its database and because Verified needed to assess whether there was successful access and what harm may have been done.

## III. DEFENDANTS OFFER NO BASIS TO DECLINE SUPPLEMENTAL JURISDICTION OVER VERIFIED'S STATE LAW CLAIMS.

Defendants do not deny that supplemental jurisdiction exists over the state law claims. Opp. Br. at 15. Instead, they argue that the Court "may decline" to exercise jurisdiction under Section 1367(c)(2), if it finds that state law claims "*substantially* predominate" over the federal claim. *Id.* (emphasis added). Courts, however, will rarely decline to do this unless all federal claims are dismissed because "the advantages of a single suit are lost. For that reason, § 1367(c)(2)'s authority should be invoked only where there is *an important countervailing interest to be served* by relegating state claims to the state court." *Rothberg v. Chloe Foods Corp.*, No. CV-06-5712 (CPS), 2007 WL 2128376, at *9-10 (E.D.N.Y. July 25, 2007) (Emphasis added.) (slip. copy) (*quoting Borough of W. Mifflin v. Lancaster,* 45 F.3d 780, 789 (3d Cir. 1995); *see also State of N. Y. v. Phillip Morris Inc.,* 1998 WL 2574, at *2 (S.D.N.Y. 1998) (same). Defendants have identified no "important countervailing interest" in this case, and in the only case they cite, the court *did* exercise supplemental jurisdiction, because "remanding the state law claims would result in duplicative work." *Dunlop v. City of New York,* 2006 WL 2853972 at *6 (S.D.N.Y. Oct. 4, 2006).

Moreover, federal courts routinely exercise supplemental jurisdiction where, as here, the federal claim "'arises out of a series of events that are interrelated' with the state law claims.'"

*Rothberg*, 2007 WL 2128376 at *9-10 (*quoting Dunlop,* 2006 WL 2853972, at *6); *see also SST Global Tech., LLC v. Chapman*, 270 F. Supp. 2d 444, 458 (S.D.N.Y. 2003) (exercising supplemental jurisdiction where "substantial interplay" between federal and state law claims). Fischer's unauthorized access of Salesforce is the starting point event that permeates both the federal and state law claims, the it should not be addressed piecemeal by two courts. Indeed, defendants admit as much when they claim Fischer's last day access was "authorized" in defense of all of the state law claims. Opp. Br. at 11, 18, 22.

## IV. DEFENDANTS FAIL TO REFUTE THAT THE SALESFORCE INFORMATION DOWNLOADED BY FISCHER IS A TRADE SECRET.

Defendants' claim that the "List" is not a trade secret rings hollow because although the "List" *may* be all that Fischer *printed* on his last day of employment, it does not constitute all of the information Fischer *downloaded* that day. While Fischer may contend that his "List" of contacts did not take years to develop, the actual 809 contacts which he downloaded from the Salesforce Database on December 5 did.

The data Fischer downloaded on December 5 is more than company names and address that are available by searching through Fortune 500 or trade association rosters. The Database also reveals the contact information for *individuals* that Verified had identified as the key decision makers for the types of contracts Verified and its competitors are seeking. In the face of arguments nearly identical to those here, the Second Circuit affirmed an injunction that barred former employee from soliciting contacts, finding that "the identities of individual contact people" with whom the former employee dealt while employed by the plaintiff were trade secrets. *N. Atl. Instruments, Inc. v. Haber, et al.*, 188 F.3d 38, 46 (2d Cir. 1999); *B.U.S.A. Corp. v. Ecogloves, Inc.*, 2006 U.S. Dist. LEXIS 85988 (S.D.N.Y. Jan. 31, 2006) (same); *Laro Maint. Corp. v. Culking*, 681 N.Y.S.2d 79, 80 (2d Dep't 1998) (Upholding an injunction against former employee

from contacting customers served while he was employed by plaintiffs). None of the rosters or public sources defendants point to would provide this information.

Moreover, even with respect to government and airport officials populated in the Database by Charles Simon ("csimo" on Fischer Ex. A), Verified's selection of which officials it chose to contact over the last few years as this nascent industry grows is revealing as to Verified's strategies.[4] The fact that contact information for such officials may be readily available says nothing about the value of Verified's efforts over the last years or the strategy regarding whom to contact. *See, e.g., Markowitz v. Serio*, 39 A.D.3d 247, 248 (N.Y.A.D. 1 Dept. 2007) (protecting a compilation of public information from which competitive information could be deduced). And often it is identification of the key assistants to officials that matters, not the identity of the public officials themselves. *See N. Atlantic Inst.*, 188 F.3d at 46.

Finally, it is no defense for defendants to say that information contained in Verified's database could be compiled from the public domain when, instead of doing that, Fischer stole the information. Where the employee has "stolen or memorized the customer lists" it is no defense to claim that the identities of the customers are "readily ascertainable" from other sources. *Universal Marine Medical Supply, Inc. v. Lovecchio*, 8 F.Supp.2d 214, 222 (E.D.N.Y. 1998) (compiling cases and denying motion to dismiss trade secret claims where plaintiff alleged that defendant stole its customer list). And Fischer shows that even the contacts on his "List" cannot all be derived from the public databases as Defendants claim. *See* Fischer Aff. ¶ 35.

## V. DEFENDANTS FAIL TO REFUTE IRREPARABLE HARM.

Defendants claim Verified faces no irreparable harm because the emails already sent by FLO and its representatives are "innocuous." Opp. Br. at 21. What the emails show is that

---

[4] Fischer mistakenly refers to these contacts as those of Robert Cimino. Fischer offers no plausible explanation why he needed the 64 contacts developed by Mr. Simon in addition to his own, and he was not authorized to take them.

defendants have improperly used Verified's confidential information for their own benefit. This is part of a pattern by Fischer as demonstrated by his conduct during the Little Rock Airport events and the subsequent telephone conversation, where he again showed a willingness to use Verified's confidential information to compete unfairly. *See* Brill Aff. ¶¶ 18, 21. FLO has not denied that it was aware of Fischer's prior improper behavior or that its President called him "an unguided missile." *Id.* at 27. Verified has shown a likelihood of irreparable harm based on the fact that its competitor has taken its confidential information and shown a willingness to use it for its own benefit. As to that harm, defendants offer nothing.

## VI. THE RELIEF SOUGHT IS APPROPRIATE

The only relief sought that defendants object to is the bar on solicitation of the Salesforce contacts for six months. (Opp Br. at 24.) The TRO relief, however, will only run until the preliminary injunction hearing, which Verified requests be held expeditiously. If Defendants truly believe that the "List" is all that Defendants have, then the injunctive relief is necessarily narrow. If, however, the evidence shows that Defendants have more information, the relief is entirely appropriate. Verified is prepared to let the evidence dictate.

Dated: New York, New York
August 1, 2007

MORRISON & FOERSTER LLP

By: [signature]
Jamie A. Levitt
Damion K.L. Stodola
1290 Avenue of the Americas
New York, New York 10104
(212) 468-8000
*Attorneys for Plaintiff Verified Identity Pass, Inc.*

Lori A. Schechter (*pro hac vice* pending)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
(415) 268-7000